# UNGAR *v.* SARAFITE, JUDGE OF THE COURT OF GENERAL SESSIONS OF THE COUNTY OF NEW YORK.

No. 167.   Argued February 24, 1964.—Decided March 30, 1964.

*Osmond K. Fraenkel* and *Emanuel Redfield* argued the cause for appellant. *Mr. Redfield* also filed briefs for appellant.

*H. Richard Uviller* argued the cause for appellee. With him on the brief was *Frank S. Hogan.*

*Osmond K. Fraenkel* filed a brief for the New York Civil Liberties Union, as *amicus curiae,* urging reversal.

Mr. Justice White delivered the opinion of the Court.

The appellant, Ungar, was adjudged guilty of criminal contempt for his conduct as a witness in a state criminal trial in a hearing presided over by the judge before whom the contempt occurred at trial. The New York Court of Appeals affirmed the conviction, 12 N. Y. 2d 1013, 1104, 189 N. E. 2d 629, 190 N. E. 2d 539, and we noted probable jurisdiction to consider whether the procedures seemingly authorized by §§ 750 and 751 of the New York Judiciary Law were consistent with the Due Process Clause of the Fourteenth Amendment. 375 U. S. 809. We have decided that the constitutional objections which this record shows to have been seasonably tendered to the New York courts and decided by them are without merit.

## I.

The contempt proceeding grew out of the trial of Hulan Jack for conspiracy to obstruct justice and for violation of New York's conflict of interests laws. Ungar, a lawyer, was an important prosecution witness, familiar with the matters on which the charges were based and immune from prosecution for his testimony on these matters before the grand jury. From the outset of the second Jack trial, Ungar, a hostile prosecution witness, engaged in much wrangling with the prosecutor over the form of the questions asked and was unresponsive to various questions. Although counsel for the defendant did not object, the witness believed that the prosecutor's ques-

tions presented the defendant's case in a bad light or failed to elicit the whole truth.[1]  On several occasions the trial judge instructed the witness to answer the questions as they were asked, if he could, but not to rephrase the questions or to offer testimony gratuitously.[2]

---

[1] In explaining his conduct at trial, Ungar stated in his petition to the New York Supreme Court, Appellate Division:

"On the basis of facts known to petitioner, it is petitioner's belief and opinion that Hulan E. Jack is absolutely innocent of each and every of the crimes charged against him, including those of which he was found guilty at the second Jack trial.  Petitioner believes that in truth and in fact evidence available to the District Attorney of New York County, which would have created a reasonable doubt as to Mr. Jack's guilt or innocence, was deliberately and wilfully suppressed, as will appear more fully hereinafter.  One of the grounds of petitioner's conviction for criminal contempt is petitioner's statement to the foregoing effect during a moment of great emotional stress and physical and mental exhaustion at the second trial of Hulan E. Jack on November 25, 1960."

[2] The following incidents are typical:

"Q. You had discussions?

"A. A preliminary discussion with Mr. Gale.  If you want me to tell you what he said I will be glad to.

"Q. Mr. Ungar, just confine your answers to my questions.

"A. I am sorry.

"Q. You discussed this matter of the lease with Mr. Gale and with Mr. Cymrot, is that correct?

"A. No.  I can't accept the way you put that question.  I discussed—

"The Court: No.

"The Witness: No, I can't accept that.

"The Court: It is not a question of whether you accept it, it is a question of whether you can answer it.

"The Witness: I can't answer that question that way.

"The Court: Next question.

"Q. The point is, you did discuss the matter of the lease with Mr. Cymrot and Mr. Gale, am I correct?

"A. I don't know how to answer that question the way you frame it because—

"The Court: That is enough.  Next question, Mr. Scotti.  Did you talk to these people?  [Footnote 2 continued on pp. 578–579]

578

When Ungar failed to heed these instructions, the judge admonished him in chambers "to confine his answers to the questions" and to leave the defense to the accused's counsel; he warned the witness that he would hold him to the natural consequences of his acts. The pattern,

---

"The Witness: Yes.
"The Court: Did they talk to you?
"The Witness: Yes.
"The Court: About the lease, the terms of the lease?
"The Witness: No.
"The Court: Next question.

.        .        .        .        .

"Q. Let me put this question to you, then: Did there come a time while you were discussing with the owners of 299 Broadway—I withdraw the question. When the lease, the proposed lease had been submitted by the Bureau of Real Estate to the Board of Estimate for their consideration, and before the scheduled date for a hearing before the Board of Estimate, which was October 24, 1957, is that when you discussed this matter of the proposed lease with the defendant, Mr. Jack? . . .

"A. I can say only at this time I do not remember. I can only remember what you refreshed my recollection about, as to the testimony I gave in the Grand Jury on this subject.

"Q. You say that when you are mindful of the fact that I had refreshed your memory with respect to this matter?

"A. No, I am mindful of the fact that you read to me certain testimony that I had given before the Grand Jury on this matter, but I cannot recall the conversations. I didn't recall it the last time and I do not recall them now, but I will adopt what you said in the Grand Jury if I said it there.

"Mr. Baker thereupon requested a conference at the bench. Counsel for both sides had a discussion with the judge at the bench out of the hearing of the jury, after which the following took place on the record in open court in the presence of the jury:

"The Court: Now, Mr. Witness, the subject matter discussed at the bench with the Court related to your volunteering about the Grand Jury, concerning which you were not asked anything, and it created a problem here which the lawyers discussed, which Mr. Baker raised with the Court. There would have been no such problem if you had not referred to Grand Jury testimony.

however, continued. On November 25, the third day Ungar was on the stand, the court instructed him to give a responsive answer to a question of apparent significance to the State's case. Thereupon Ungar, before answering, requested a recess, claiming that he was being "pressured and coerced and intimidated into testifying" and that he

---

"Now, may I please ask you when you are asked a question, just answer yes or no, please. Don't volunteer anything.

"Proceed.

.          .          .          .          .

"Q. This is your recollection of your previous testimony?

"A. Yes.

"Q. Now, you did testify that you probably mentioned casually to him that you were buying this property and that the city was the lessee, and do you recall saying this at the last trial—

"Q. 'I can't tell you in substance because I have no independent recollection of any conversation. I probably mentioned casually to him that I was buying this property, and that the city is the lessee, and I think I said that half a dozen times too.'

"Q. Was that correct?

"A. Just a minute. I don't know what you mean by the last part of what you are reading. I probably said in my testimony half a dozen times, not that I spoke to him, the defendant, a half a dozen times.

"The Court: Mr. Witness, try not to do that, please. Just listen to the question. The questioner is asking you, 'Did you testify as follows at the last trial?' Try to confine your answer to that question.

"The Witness: May I look at the testimony?

.          .          .          .          .

"A. No, I don't have the figures in front of me at this point.

"I would like to explain the matter, which I think could simplify it very quickly.

"The Court: No, no, no, Mr. Ungar. Please don't volunteer statements like that.

"As I indicated to you before, we have lawyers who conduct litigation. They have a right to phrase questions. It is not for you to volunteer anything. If you want to explain, or if the question is not satisfactory to you, that's none of your business.

"Now, please, keep that in mind, will you."

was being "badgered by the Court and by the District Attorney." When the court granted a short recess but refused Ungar permission to leave the stand, the following ensued:

> "The Witness: I can't testify, I'm sorry, your Honor. I am not in any physical or mental condition to testify.
>
> "The Court: Mr. Witness, no one asked you anything. Nobody is questioning you. You are not testifying. We have taken a recess for about three minutes of silence, and we will take a few more minutes.
>
> "The Witness: I would like to leave the stand, your Honor.
>
> "The Court: No, you may not leave the stand.
>
> "The Court: Proceed, Mr. Scotti.
>
> "The Witness: I am not going to answer questions, your Honor. I am not going to testify in this confusion, and the Court nor anyone else will make me testify in this emotional state. I am absolutely unfit to testify because of your Honor's attitude and conduct towards me. I am being coerced and intimidated and badgered. The Court is suppressing the evidence.
>
> "The Court: You are not only contemptuous but disorderly and insolent." [3]

The judge called a recess, during which counsel for the defendant requested the court to appoint a doctor to determine whether Ungar was malingering or incapable of testifying. Upon resumption, Ungar represented that

---

[3] Section 750, Judiciary Law of New York, defines criminal contempt as:

"1. Disorderly, contemptuous, or insolent behavior, committed during [the court's] sitting, in its immediate view and presence, and directly tending to interrupt its proceedings, or to impair the respect due to its authority. . . ."

he obtained his own medical assistance, the court agreed with Ungar that he was competent to testify, and denied the request. Ungar testified for another day without further incident.

The Jack trial ended on December 6, 1960, and during the afternoon of December 8, 1960, Judge Sarafite, the trial judge, pursuant to the New York procedure governing nonsummary trial of contempts, had served on Ungar a show-cause order charging that Ungar's remarks from the stand on November 25 constituted a willful and disruptive contempt of court and ordering that the appellant appear on December 13 at 10 a. m. to defend against the charges. Judge Sarafite, presiding at the hearing, denied several motions for a continuance, and Ungar's retained counsel was permitted to withdraw upon informing the court that he had agreed to undertake the defense only if Ungar could obtain a continuance. After exhibits material to the charges were admitted into evidence, Ungar was asked to defend. He declined, arguing that a continuance and a hearing before another judge should be granted. The court found Ungar guilty of contempt and, taking into consideration Ungar's emotional state from the stress of the Jack trial, sentenced him to 10 days' imprisonment and imposed a fine.

The Appellate Division of the New York Supreme Court dismissed the appeal, the state procedure for review of nonsummary contempt proceedings, and denied the petition under Article 78, Civil Practice Act, the procedure for review of summary contempt convictions,[4]

---

[4] *Douglas* v. *Adel,* 269 N. Y. 144, 199 N. E. 35; *Negus* v. *Dwyer,* 90 N. Y. 402; *Pugh* v. *Winter,* 253 App. Div. 295, 2 N. Y. S. 2d 9; *Brewer* v. *Platzek,* 133 App. Div. 25, 117 N. Y. S. 852.

Decisions of the New York courts make clear that a contempt committed in the presence of the court may be punished by the nonsummary procedure applicable to other contempts of court. *Goodman* v. *Sala,* 268 App. Div. 826, 49 N. Y. S. 2d 245; *Choate* v. *Barrett,* 56 Hun 351, 9 N. Y. S. 321, aff'd, 121 N. Y. 678, 24 N. E. 1095.

both without opinion. 16 App. Div. 2d 617. The New York Court of Appeals affirmed, also without opinion. 12 N. Y. 2d 1013, 189 N. E. 2d 629. It denied the appellant's motion for reargument, the only part of the record before this Court in which appellant's federal constitutional claims were asserted, and granted in part appellant's motion to amend the remittitur to show that certain constitutional questions were passed upon in the appeal. Treating both the appeal and the Article 78 proceeding identically, the Court of Appeals ruled in the amended remittitur that rights under the Fourteenth Amendment had been raised and passed upon and stated that "appellant argued that such rights were violated by (1) the trial judge's refusal to grant an adjournment of the contempt proceeding upon proof of the engagement of his counsel; (2) the trial judge's invoking of summary power under § 751 of the Judiciary Law seven days after the end of the trial during which the contempt was committed, and (3) the same trial judge's presiding in the resulting contempt proceeding even though he was the judge 'personally attacked.' " In response to the third contention, the court ruled that the appellant's remarks were not a personal attack upon the judge. 12 N. Y. 2d 1104, 190 N. E. 2d 539.

## II.

We have determined that the appeal must be dismissed for want of jurisdiction. The Jurisdictional Statement contains a statutory attack on the validity of § 750, Judiciary Law, as unduly vague, and on § 751 as authorizing a judge who is personally attacked to preside over a contempt hearing and as authorizing summary proceedings after the trial in which the contempt occurs. Nothing in the record shows that these issues were tendered to the Appellate Division or the Court of Appeals prior to the motion for reargument or to amend the remittitur. Only the latter was granted and then only in part. Therefore

the amended remittitur is determinative in this Court on the constitutional issues raised and necessarily passed upon in the state courts. *Bailey* v. *Anderson,* 326 U. S. 203. That remittitur speaks of rights asserted and passed upon under the Fourteenth Amendment and does not indicate that a state statute was "drawn in question" and sustained over constitutional objections. See *Mergenthaler Linotype Co.* v. *Davis,* 251 U. S. 256, 259; *Charleston Federal Savings & Loan Assn.* v. *Alderson,* 324 U. S. 182, 185–186. The appeal is accordingly dismissed.[5] Treating the appeal as a petition for certiorari, certiorari is granted, 28 U. S. C. § 2103, *Anonymous* v. *Baker,* 360 U. S. 287, limited, however, to the three constitutional issues which the amended remittitur states petitioner had argued and which, we assume, were the constitutional questions the New York Court of Appeals passed upon.

## III.

Petitioner, Ungar, claims his constitutional rights to a fair hearing were violated because his contemptuous remarks were a personal attack on the judge which necessarily, and without more, biased the judge and disqualified him from presiding at the post-trial contempt hearing. The New York Court of Appeals rejected the claim and we see no error in this conclusion. Assuming that there are criticisms of judicial conduct which are so personal and so probably productive of bias that the judge must disqualify himself to avoid being the judge in his own case, we agree with the New York court that this is not such a case.

---

[5] Appellant concedes that the vagueness objection to the state statute was not explicitly argued to the Court of Appeals. The trial judge did not purport to invoke summary power under § 751, Judiciary Law, and the Court of Appeals expressly declined to construe § 751 to authorize a trial judge personally attacked to preside at the contempt proceedings.

It is true that Ungar objected strongly to the orders of the court and to its conduct of the trial during his examination. His final outburst, the subject of the contempt, was a flat refusal to answer, when directed by the court, together with an intemperate and strongly worded comment on the propriety of the court's ruling. But we are unwilling to bottom a constitutional rule of disqualification solely upon such disobedience to court orders and criticism of its rulings during the course of a trial. See *Nilva* v. *United States,* 352 U. S. 385.[6] We cannot assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with resistance to their authority or with highly charged arguments about the soundness of their decisions. Apparently because Ungar was being required to answer the questions asked rather than some others which he would rather have answered and because he was directed to cease volunteering testimony, Ungar claimed he was being "badgered" and "coerced" and that the court was "suppressing the evidence." This was disruptive, recalcitrant and disagreeable commentary, but hardly an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification.

Nor is there anything else of substance in this record which shows any deprivation of petitioner's right to be tried by an unbiased and impartial judge without a direct personal interest in the outcome of the hearing. *Tumey* v. *Ohio,* 273 U. S. 510. *In re Murchison,* 349 U. S. 133.

---

[6] See also Fed. Rules Crim. Proc. 42 (b): "Disposition Upon Notice and Hearing. A criminal contempt [except one subject to summary disposition] . . . shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. . . . If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent."

The Court in the latter case held that a judge acting as a one-man grand jury investigating crime could not convict for contempt witnesses who he believed testified falsely or inadequately before him in secret grand jury proceedings and is not controlling here. For both *In re Oliver,* 333 U. S. 257, and *Murchison* make abundantly clear that the Court was not dealing therein with the traditional category of contempts committed in open court, which cannot be likened to the so-called contempts committed in *in camera* grand jury proceedings, especially when the latter are founded upon perjury charges.

Unlike *Cooke* v. *United States,* 267 U. S. 517, and *Offutt* v. *United States,* 348 U. S. 11, which were contempt cases from lower federal courts in which the Court found personal bias sufficient to disqualify the judge from convicting for contempt, this record does not leave us with an abiding impression that the trial judge permitted himself to become personally embroiled with petitioner. Whatever disagreement there was between petitioner and the judge stemmed from the petitioner's resistance to the authority of the judge and its exercise during the trial. Petitioner was strongly admonished that his conduct was disruptive and disorderly and that he would be held to the natural consequences of his acts. But requiring petitioner to answer the questions put to him and to cease caviling with the prosecutor was fully in accord with the judicial obligation to maintain the orderly administration of justice and to protect the rights of the defendant on trial. Neither in the courtroom nor in the privacy of chambers did the judge become embroiled in intemperate wrangling with petitioner.[7]  The judge dealt firmly with Ungar, but

---

[7] The following excerpt from the discussion in the judge's chamber following persistent resistance to instructions to answer questions is probably the most intense disagreement between petitioner and the judge that occurred during the trial.

"The Court: Now, Mr. Witness, this case was tried once before and took considerable time. You were a witness for many days. A

without animosity, and petitioner's final intemperate out-
burst provoked no emotional reflex in the judge.  See
*Fisher* v. *Pace,* 336 U. S. 155.  The characterization of
the petitioner's conduct as contemptuous, disorderly, and

---

number of incidents occurred in that trial which, in my judgment,
directly tended to interrupt the proceedings of the Court and to
impair the respect due to the authority of the Court, and you were
the one who created those incidents, in my judgment.

"I told you then, at the first trial, that you were creating a very
serious problem for the Court and that, as a lawyer, I assumed you
knew what the problem was.

"I should like very much to avoid any repetition of what happened
the last time.

"We each have a function to perform here.  Whether it is an
agreeable function or a disagreeable function is of no concern.

"Now I have said to you up to now on a number of occasions that
you should confine your answers to the questions, not to volunteer,
not to get into any dispute or discussions, not to try to indicate what
you think the question should be or how you should answer it.

"This is a trial before the jury, not before the Court alone.  As a
judge, I must rule in accordance with my understanding of the law,
which I am doing.

"I hope you understand what I am saying, Mr. Ungar.  Do you?

"The Witness: Well, I would like to say a word, if I may.

"The Court: No.

"The Witness: I can't understand what your Honor is saying.

"The Court: Then if you can't understand—

"The Witness: I understand what your Honor is saying—

"The Court: I don't want anything further, Mr. Ungar.  All I
want to add to what I have said, since you said you do not under-
stand what I am saying—

"The Witness: I understand what your Honor is saying.

"The Court: You said you didn't.

"The Witness: But I cannot understand it in a vacuum; that's
what I am trying to say, your Honor.

"The Court: Don't argue with me, Mr. Ungar.

"The Witness: I have got to understand the question, in order to
answer it.  I can't answer a question merely if your Honor says,
'Answer it,' if it doesn't make sense to me or if it's creating a false
impression—                          [*Footnote 7 continued on pp. 587–588*]

malingering was at most a declaration of a charge against the petitioner, based on the judge's observations, which, without more, was not a constitutionally disqualifying prejudgment of guilt, just as issuance of a show-cause

"The Court: Will you desist. You see, it's none of your business whether it creates in your judgment a false impression or not. The defendant is represented here by a lawyer, and the People are represented by a lawyer. It is for them to conduct this litigation, and not you.

"Now I am only going to make one more statement and we will return to the courtroom.

"There is a rule of law that every man is presumed to intend the natural consequences of his act. I am going to hold you to that standard. And whether you tell me that you understand what I said or not will not be the test that I shall use in whatever action I propose to take."

"Not only should you, as a man and a citizen, be held to intend the natural consequences of your act, but you as a lawyer should be held to a higher standard of knowing that you are responsible for the natural consequences of your act.

"Also, there is a rule that every citizen is presumed to know the law. I take it that every citizen does not know the rules of the law of evidence. But as a lawyer, you certainly know the rules of law of evidence.

"Let's return to the courtroom.

"The Witness: I think I have a right, if your Honor please—

"The Court: I shall not—

"The Witness: —to have a statement made.

"Your Honor has made a statement which is intimidating. Your Honor has made a statement which is coercive, and I think I have a right to make a statement.

"Now if your Honor intends to take action against me, I submit that the action should be taken here and now. But I insist upon a right, and think that I am justified as a witness to make a statement before your Honor takes any action.

"I have a right to understand any question that's propounded to me, and I have a right, if a question is framed in such a way which creates a reflection upon me and which is not a fact—I have a right—

"The Court: Keep your voice down, Mr. Ungar. I kept my voice down.

order in any criminal contempt case, based on informa-
tion brought to the attention of a judge, is not such
a prejudgment of guilt. Moreover, Judge Sarafite, al-
though believing that Ungar's conduct was disruptive of
the trial, did not purport to proceed summarily during
or at the conclusion of the trial, but gave notice and
afforded an opportunity for a hearing which was con-
ducted dispassionately and with a decorum befitting a
judicial proceeding. In these circumstances, we cannot
say there was bias, or such a likelihood of bias or an
appearance of bias that the judge was unable to hold the
balance between vindicating the interests of the court
and the interests of the accused.

## IV.

Petitioner's additional attack upon the hearing afforded
him centers upon the denial of his motion for a continu-

"The Witness: I'm sorry, I apologize.

"The Court: And stop doing that. Don't raise your voice. And
you have said enough. I have your point.

"Now the Court is not intimidating you. It is not coercing you,
and it is not threatening you.

"The Witness: I disagree with your Honor.

"The Court: I didn't ask you whether you disagreed.

"And I suggest to you, Mr. Ungar, that you speak when you are
asked to speak, from now on—please.

"Now the purpose of calling you in here was not to intimidate you
or coerce you in the slightest. But the purpose is to avoid a repeti-
tion in the courtroom of the unseemly performance of the last trial,
which I shall not tolerate.

"Now let's return to the courtroom.

"The Witness: I believe I have tried—

"The Court: I told you to speak when you were asked to speak.

"The Witness: Have I a right—

"The Court: No.

"The Witness: Have I a right to understand questions?

"The Court: Let's return to the Courtroom.

"The Witness: I am asking the Court if I have a right to ask the
question—"

ance which is said to have deprived him of his constitutional right to engage counsel and to defend against the charge. The State, among other arguments, denies Ungar's right to any hearing at all, relying upon *Sacher* v. *United States,* 343 U. S. 1, as permitting the judge summarily to convict for contempt at the conclusion of trial. We do not and need not, however, deal with the circumstances in which a trial judge may or may not constitutionally resort to summary proceedings after trial. For in this instance, assuming a nonsummary hearing was required,[8] the hearing afforded petitioner satisfied the requirements of due process.[9] *In re Oliver,* 333 U. S. 257; *In re Green,* 369 U. S. 689.

The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. *Avery* v. *Alabama,* 308 U. S. 444. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. *Chandler* v. *Fretag,* 348 U. S. 3. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. *Nilva* v. *United States,* 352 U. S. 385; *Torres* v. *United States,* 270 F. 2d 252

---

[8] This disposes of petitioner's second argument set out in the amended remittitur of the Court of Appeals that the invocation of summary power seven days after the end of the trial during which the contempt was committed denied due process.

[9] These requirements include the right to be adequately advised of charges, a reasonable opportunity to meet the charges by way of defense or mitigation, representation by counsel, and an adequate opportunity to call witnesses.

(C. A. 9th Cir.); cf. *United States* v. *Arlen,* 252 F. 2d
491 (C. A. 2d Cir.).

Ungar was served with a show-cause order on Thursday at about 5 p. m.,[10] the hearing being scheduled for the following Tuesday at 10 a. m. Ungar appeared with counsel at the appointed time. Two short continuances were then granted to allow another lawyer to appear for Ungar. When the latter arrived, the case was again called and counsel requested a one-week delay, informing the court that he was unfamiliar with the case because he had not been contacted until Saturday and because he was then busily engaged in trying another case. The court denied the motion for adjournment, being of the view that Ungar had been afforded sufficient time to hire counsel who would be available at the time of the scheduled hearing. We cannot say that this decision, in light of all the circumstances, denied petitioner due process. The five days' notice given petitioner was not a constitutionally inadequate time to hire counsel and prepare a defense to a case in which the evidence was fresh, the witnesses and the evidence readily available, the issues limited and clear-cut and the charge revolving about one statement made by Ungar during a recently completed trial. Furthermore, the motion for continuance was not made until the day of the scheduled hearing and Ungar himself was a lawyer familiar with the court's practice of not granting adjournments.

After denial of the motion, counsel was permitted to withdraw and the hearing proceeded. Ungar himself then argued for a continuance on the same ground as his counsel and on the additional ground that a few hours were needed to enable him to present medical proof and expert testimony showing no contempt was intended.

---

[10] Ungar was also told after his outburst on November 25 "to keep himself available" for further proceedings.

He also referred to a snowstorm on the previous Sunday and Monday which allegedly had prevented any preparation with counsel. The motion was again denied and again we can find no denial of due process. Ungar asserted no reason why the testimony and medical proof, which he conceded were readily available and producible within hours, was not obtained between Thursday and Tuesday and presented in court at the time of the scheduled hearing, nor did he name the witnesses he would call nor did he give the substance of their testimony. The trial judge could reasonably have concluded that petitioner's reliance upon inclement weather was less than candid since Ungar's counsel's previous statement that he could not represent Ungar without an adjournment was grounded upon his engagement in another trial. These matters are, of course, arguable, and other judges in other courts might well grant a continuance in these circumstances. But the fact that something is arguable does not make it unconstitutional. Given the deference necessarily due a state trial judge in regard to the denial or granting of continuances, we cannot say these denials denied Ungar due process of law.

The judgments are

*Affirmed.*

Mr. Justice Harlan, concurring.

I agree with and join the opinion of the Court, but wish to add that the contempt procedure employed by Judge Sarafite accorded Ungar more than his due under *Sacher* v. *United States,* 343 U. S. 1. In light of that case it is clear that Judge Sarafite, so far as the Federal Constitution is concerned, could have proceeded at the close of the main trial to hold Ungar in contempt without any hearing at all. The fact that the contempt adjudication followed a five-day notice given Ungar two days

after the close of the trial cannot, as a constitutional matter, well be deemed to have extinguished the judge's power to proceed summarily.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE GOLDBERG concur, dissenting.

This case is a classic example of one situation where the judge who cites a person for contempt should not preside over the contempt trial.[1]    That was the result in *Offutt* v. *United States,* 348 U. S. 11, 17, where the judge became "personally embroiled" with the person he later held in contempt; and we, pursuant to our supervisory authority over the federal system, ordered a new trial before a disinterested judge.    The same result is required under due process standards.    *In re Murchison,* 349 U. S. 133.

I start with what Chief Justice Taft wrote in *Cooke* v. *United States,* 267 U. S. 517, 539:

> "This rule of caution is more mandatory where the contempt charged has in it the element of personal criticism or attack upon the judge.    The judge must banish the slightest personal impulse to reprisal, but he should not bend backward and injure the authority of the court by too great leniency. The substitution of another judge would avoid either tendency but it is not always possible.    Of course where acts of contempt are palpably aggravated by a personal attack upon the judge in order to drive the judge out of the case for ulterior reasons, the scheme should not be permitted to succeed.    But attempts of this kind are rare.    All of such cases,

---

[1] This is not a case of summary contempt during the course of a trial, where "immediate punishment is essential to prevent 'demoralization of the court's authority' before the public."    *In re Oliver,* 333 U. S. 257, 275.

however, present difficult questions for the judge. All we can say upon the whole matter is that where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place."

There is in our annals a no more apt case for following that course than the present one. Here the judge who cited petitioner for contempt did become "personally embroiled" with him and, in substance, adjudged him a malingerer and found him guilty before the trial—indeed before the citation.

Petitioner, a witness in a criminal trial in a New York court, was found guilty of contempt of court by the judge who presided at the trial, the contempt being tried after the main trial had ended.[2]  He was fined $250 and sentenced to 10 days in jail.  The conviction was sustained by the Court of Appeals without an opinion.  That court, however, said in its remittitur:

> ". . . we point out that where the alleged contempt consists *of the making of charges of wrongdoing by the trial judge himself* he should, where disposition of the contempt charge can be withheld until after the trial and where it is otherwise practicable, order the contempt proceeding to be tried before a different judge."  (Italics added.)

---

[2] Unlike *Sacher* v. *United States,* 343 U. S. 1, where the trial judge at the end of the trial summarily found counsel participating in the trial guilty of contempt, the judge in the instant case, following the procedure recommended by *Cooke* v. *United States,* 267 U. S. 517, issued a rule to show cause why the witness should not be held in contempt and held a hearing on that citation.

It was because the Court of Appeals thought that this contempt did not involve "the making of charges of wrongdoing by the trial judge himself" that it upheld trial of this contempt charge by the offended judge. But this contempt charge, as I read it, did charge such wrongdoing:

> "On said November 25, 1960, the respondent, as a witness in said trial committed a wilful contempt of court during the sitting of the Court, and in its immediate view and presence, in that he wilfully and in a repeated effort, obvious to the Court, to disrupt the orderly trial of the case therein, culminated his contemptuous conduct by shouting in a loud, angry, disorderly, contemptuous, and insolent tone directly tending to interrupt the proceedings of the Court and to impair the respect due to the authority of the Court:
>
> " 'I am absolutely unfit to testify because of your Honor's attitude and conduct towards me.   I am being coerced and intimidated and badgered.   The Court is suppressing the evidence.' "   (Italics added.)

The charge that the trial judge was "suppressing the evidence" certainly was a charge of "wrongdoing," in the sense of malfeasance.   The witness did indeed complain of the trial judge's "attitude and conduct" toward him. When he said "I am being coerced and intimidated and badgered," he meant in the setting of those words not that the prosecutor alone was misconducting himself but that the judge was also.   Any doubt is dispelled by his final statement, "The Court is suppressing the evidence." It is obvious that whatever else may be said of the alleged contempt it was aimed at the judge and implicated him and the judicial proprieties.

The episode was a head-on collision between the judge and a witness who said he could not understand the

questions asked him and therefore could not truthfully answer. It was a head-on collision between a witness who complained he was unfit to testify and a judge who said his physical condition was faked:

"The Witness: If your Honor please, I want to recess at this point. I can't testify. I am too upset, and I am much too nervous. And I can't testify under these circumstances. I am not being a voluntary witness. I am being pressured and coerced and intimidated into testifying, and I can't testify under these circumstances.

.     .     .     .     .

"The Court: We shall pause for a minute or two, Mr. Witness.

"(Whereupon, there was a brief interval of silence in the courtroom.)

"The Witness: I can't testify, your Honor. I am shaking all over. And I must have a recess, I just am absolutely a bundle of nerves at this point, and I don't know what I'm doing or saying any more.

"I ask for the privilege of leaving the stand, your Honor.

"The Court: No, you will remain on the stand.

"The Witness: I can't testify, I'm sorry, your Honor. I am not in any physical or mental condition to testify.

"The Court: Mr. Witness, no one asked you anything. Nobody is questioning you. You are not testifying. We have taken a recess for about three minutes of silence, and we will take a few more minutes.

"The Witness: I would like to leave the stand, your Honor.

"The Court: No, you may not leave the stand.

"(Whereupon, there was a further brief interval of silence in the courtroom.)

"The Court: Proceed, Mr. Scotti.

"The Witness: I am not going to answer questions, your Honor. I am not going to testify in this confusion, and the Court nor anyone else will make me testify in this emotional state. I am absolutely unfit to testify because of your Honor's attitude and conduct towards me. I am being coerced and intimidated and badgered. The Court is suppressing the evidence.

"The Court: *You are not only contemptuous but disorderly and insolent.* [Italics added.]

"The Witness: I have asked for the privilege of leaving the stand for five minutes.

"The Court: Put your question, Mr. Scotti.

.      .      .      .      .

"Q. Mr. Ungar, did you tell Mr. Jack that Saturday morning that there was a conflict between your story to me and Mr. Bechtel's story to me?

"A. I can't answer any questions. I am not even concentrating on what you are saying. I can't even think clearly at this minute any more.

"The Court: Do you refuse to answer?

"The Witness: I don't know what he is talking about, Judge. I am an emotional wreck at this time. I am asking for a recess. I ask the right to get off this stand so that I can contain myself.

"The Court: Do you refuse to answer the question, Mr. Ungar?

"The Witness: I said I can't answer the question, your Honor.

"The Court: Put the question, Mr. Reporter.

"Mr. Scotti: Mr. Reporter, read the question.

"(The question was read by the Court Stenographer as follows:

" 'Q. Mr. Ungar, did you tell Mr. Jack that Saturday morning that there was a conflict between your story to me and Mr. Bechtel's story to me?')

"The Court: Let the record show that the defendant has remained silent and has not answered the question for four minutes.

"Mr. Scotti: You mean the witness, your Honor.

"The Court: What did I say?

"Mr. Scotti: The defendant.

"The Court: Obviously I meant the witness. Very well, we will advance our luncheon recess.

"Do not discuss the case, ladies and gentlemen, do not form or express any opinion as to the guilt or innocence of this defendant until the case is finally submitted to you. Since we are advancing the hour when we start our luncheon recess, we will get back here at 1:45. You may retire.

"(The jurors then left the Court room and the following took place in their absence:)

"Mr. Baker [counsel for defendant]: May I be heard before the Court leaves?

"The Court: Yes.

"Mr. Baker: There has been a statement made by the witness that he is emotionally or mentally incapable of testifying. So that the record would be crystal clear, I make a request of the Court to appoint a doctor to determine whether or not there is malingering on the part of the witness or anything of the sort.

"The Court: In my judgment, *this is as near as malingering could ever be determined from my observation.* [Italics added.]

"The Witness: I join in that request, if your Honor please.

"The Court: What is the ground of your application?

"Mr. Baker: The ground of my application is, if the Court please, the law presumes that when a witness testifies he is to be lucid.   This witness says he is not.   Any testimony he gives may be prejudicial to the rights and interests of the defendant. That's the ground of my objection, and so that the record would be clear, whether this is malingering or not, there is a mental and emotional condition presently existing in this witness so that he could not be a competent witness to testify, all of which may be to the detriment of the defendant.

"The Court: I shall reserve decision on your application and I shall direct the witness to remain in court until I decide it.   The Court will take a recess until 1:45.

"(After a short recess the Court returned to the courtroom, Mr. Baker and the defendant being present, and the following took place:)

"The Court: Mr. Baker, I wanted to get both sides here.   The reason I have asked Mr. Ungar to remain was because if I had made a decision, why, then, I could have acted on it.   Since I haven't made a decision I see no point in having him remain here. He is entitled to take his luncheon recess the same as anybody else, but I didn't want to lose time if I could help it.

"Mr. Baker: I am glad the Court indicated the purpose of asking the witness to remain.

"The Court: That was the only purpose, because I said to you I reserve decision, and I thought I might be able to decide it and save time.   Would it be a burden to give me another five minutes?

"Mr. Baker: No, your Honor.

"The Witness: Is your Honor addressing me?

"The Court: Yes.

"The Witness: No, it is not a burden, your Honor, because I was not malingering, and I have been shaking ever since this issue started.

"The Court: I just want five more minutes, and if I don't decide it by that time then we will all go to lunch.

"(A short recess was taken; the Court left the courtroom and returned.)

"The Court: Mr. Ungar, I haven't made up my mind what course of action I should take. I think you ought to take a recess until 1:45. Let us see what the situation is at that time.

.      .       .       .       .

"The Court: Now, Mr. Witness, before we took a luncheon recess you personally, as a witness, had asked for a recess. Do you recall that?

"The Witness: I do, your Honor.

"The Court: Now that we have had the luncheon recess and you have come back, do you still ask for a recess?

"The Witness: Well, I would like to report to the Court that I went to the hospital and received an injection, and I think that I can proceed temporarily, in addition to the pills that I have taken this morning.

"The Court: Very well.

"Mr. Scotti: May I proceed, your Honor?

"The Court: Yes."

When counsel for the defendant again asked for a ruling on the motion to have a doctor examine petitioner the Court said:

"I thought it was obvious to everyone that when the witness resumed the stand at 1:45 P. M. after the luncheon recess, and the Court asked the witness

whether his request for a recess while testifying on the stand, and before the announcement of the luncheon recess, still stood. The witness said he had been to a hospital to get a shot, and that he could.

"Mr. Scotti: That he could proceed temporarily.

"The Court: That he could proceed temporarily, and I thought that everyone then understood that the witness himself had concluded the issue by declaring that he was then able to proceed, and consequently made no formal declaration on the record.

"To avoid any possible question about that I now deny the motion."

A financial interest in the outcome of a case, as in *Tumey* v. *Ohio,* 273 U. S. 510, will, of course, disqualify a judge from sitting. As Chief Justice Taft said in that case:

"The Mayor received for his fees and costs in the present case $12, and from such costs under the Prohibition Act for seven months he made about $100 a month, in addition to his salary. We can not regard the prospect of receipt or loss of such an emolument in each case as a minute, remote, trifling or insignificant interest. It is certainly not fair to each defendant, brought before the Mayor for the careful and judicial consideration of his guilt or innocence, that the prospect of such a loss by the Mayor should weigh against his acquittal." *Id.,* at 531–532.

The bias here is not financial but emotional. *In re Murchison, supra,* involved a closely related question arising in a state case. There the judge who served as the "one-man grand jury" also had doubts about the way in which a witness testified before him. He charged him with contempt for refusing to answer. We reversed the conviction, saying,

"It would be very strange if our system of law permitted a judge to act as a grand jury and then try the

very persons accused as a result of his investigations. Perhaps no State has ever forced a defendant to accept grand jurors as proper trial jurors to pass on charges growing out of their hearings. A single 'judge-grand jury' is even more a part of the accusatory process than an ordinary lay grand juror. Having been a part of that process a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused. While he would not likely have all the zeal of a prosecutor, it can certainly not be said that he would have none of that zeal. Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer." 349 U. S., at 137.

The present case is a stronger case for reversal than *In re Murchison.* There the bias of the judge was inferred. Here it is apparent on the face of the record. For when the witness said "The Court is suppressing the evidence," the judge replied, *"You are not only contemptuous but disorderly and insolent."* (Italics added.) Moreover, while petitioner was still on the stand as a witness in the main case, the judge condemned him as a malingerer and refused to order a medical examination. Thus, long before the contempt trial—long before the contempt charge had been filed—the judge, who later sentenced the witness for contempt, had concluded—and stated in so many words—that the witness was "contemptuous." It is a travesty on American justice to allow a judge who has announced his decision on the issue of guilt prior to the trial to sit in judgment at the trial.

Judges are human; and judges caught up in an altercation with a witness do not have the objectivity to give that person a fair trial. In the present case, the *basic* issue was whether the witness was sick or whether he was faking. The judge, who found him guilty for an outburst

that might have been excused coming from the lips of a sick man, had announced his decision when the witness asked to be excused. He then said that the witness was a malingerer; and he refused to call a doctor.

This aspect of the case emphasizes a second reason why a different judge should have tried the contempt charge. The judge who accused the witness of malingering was not a medical expert and his conclusion that the witness was faking, though admissible as evidence, would not be conclusive. This crucial fact was one that the judge should not be left to decide on the basis that he saw the witness and therefore could be depended upon to determine that he was not ill, as, contrariwise, he could have been depended upon to know that the accused had openly resisted a marshal, as in *Ex parte Terry*, 128 U. S. 289.

A man going on trial before that judge is denied a basic constitutional right—the right to examine and cross-examine. As we said in *In re Murchison, supra,* if the emotionally involved trial judge tries the contempt "the result would be either that the defendant must be deprived of examining or cross-examining him or else there would be the spectacle of the trial judge presenting testimony upon which he must finally pass in determining the guilt or innocence of the defendant. In either event the State would have the benefit of the judge's personal knowledge while the accused would be denied an effective opportunity to cross-examine. The right of a defendant to examine and cross-examine witnesses is too essential to a fair trial to have that right jeopardized in such way." 349 U. S., at 139.

An impartial judge, not caught up in the cross-currents of emotions enveloping the contempt charge, is the only one who can protect all rights and determine whether a contempt was committed or whether the case is either one of judicial nerves on edge or of judicial tyranny.

Mr. Justice Goldberg, with whom Mr. Justice Black and Mr. Justice Douglas join, dissenting.

I agree with my Brother Douglas that due process of law requires that this contempt be tried before a different judge.

This Court has recognized that the power of a judge to impose punishment for criminal contempt without notice or hearing is:

> "capable of grave abuses, and for that reason [the Court has never given any] encouragement to its expansion beyond the suppression and punishment of the court-disrupting misconduct which alone justified its exercise." *In re Oliver,* 333 U. S. 257, 274.

The Court has also "marked the limits of contempt authority in general as being 'the least possible power adequate to the end proposed.'" *Ibid.,* quoting *Anderson* v. *Dunn,* 6 Wheat. 204, 231.

I would hold, therefore, that the Constitution forbids a judge to impose punishment for such contempt without notice or hearing, except when (1) the contempt creates such "'an open threat to the orderly procedure of the court . . . [that if] not instantly suppressed and punished, demoralization of the court's authority will follow,'" *In re Oliver, supra,* at 275, quoting *Cooke* v. *United States,* 267 U. S. 517, 536, and when (2) "no explanation could mitigate [contemner's] offence or disprove the fact that he had committed such contempt of [the court's] authority and dignity as deserved instant punishment." *Ex parte Terry,* 128 U. S. 289, 310.

The power to punish in so summary a fashion is, as the New York Court of Appeals recognized, fraught with danger, particularly when the alleged contempt consists of a charge of wrongdoing against the very person sitting in judgment of the contempt.

MR. JUSTICE DOUGLAS has convincingly demonstrated that the contempt charged here was not such an open threat to the orderly procedure of the court as to necessitate instant punishment, that an explanation or the introduction of evidence could have mitigated or disproved the offense, and that it consisted essentially of a charge of wrongdoing against the very person sitting in judgment of the contempt.

I conclude, therefore, that this contempt could not constitutionally have been tried summarily,* and that it should have been tried before a different judge.

---

*There may well be instances of disruption where the trial judge correctly feels that some immediate action is necessary to restore order but that a full, immediate civil or criminal contempt proceeding might cause undue prejudice against the defendant in the main trial. In attempting to accommodate these conflicting demands, the trial judge should have some latitude, limited, of course, by the overriding principle of the law of contempts that the power exercised be "the least possible power adequate to the end proposed." *Anderson* v. *Dunn,* 6 Wheat. 204, 231; *In re Oliver,* 333 U. S. 257, 274.