[No. D013329. Fourth Dist., Div. One. Mar. 31, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS KENNETH SCHULZ, Defendant and Appellant.

[No. D013364. Fourth Dist., Div. One. Mar. 31, 1992.]

In re NICHOLAS KENNETH SCHULZ on Habeas Corpus.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions directed to be published follow.

**COUNSEL**

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Frederick R. Millar, Jr., and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WORK, J.**—Nicholas Kenneth Schulz appeals separate judgments convicting him of attempted murder (Pen. Code,[1] §§ 187, 664), while personally using a firearm (§ 12022.5) and personally inflicting great bodily injury (§ 12022.7); possessing a flammable or explosive device (§ 453, subd. (a)); and possessing a firebomb (§ 453, subd. (b)). Schulz's convictions arise from two trials, during which he represented himself. At the first trial, the jury hung on the great bodily injury enhancement, and Schulz was sentenced to eleven years, eight months. The second trial involved only the great bodily injury enhancement which this time was found true. After this finding, the trial court resentenced Schulz—staying the two-year sentence on the firearm use enhancement and imposing the three-year sentence on the great bodily injury enhancement, for a total sentence of twelve years, eight months. By petition for writ of habeas corpus, Schulz raises jurisdictional issues identical to those raised in his appeal from case No. D013364.

Regarding the first trial resulting in the attempted murder conviction, Schulz contends the trial court: (1) erroneously excluded evidence the victim was a commercial grower of marijuana, and that an attorney representing the victim in a civil action to recover benefits from Schulz's insurer had obtained a favorable settlement by asserting the shooting may have been accidental, and therefore not an excluded intentional act; (2) abused its discretion in first allowing, and then limiting evidence of Schulz's prior felony conviction for threatening a witness; and (3) erred in denying his motion for new trial based on juror misconduct. Regarding the retrial resulting in a finding of great bodily injury, Schulz contends: (1) it was improper to try the enhancement after he had already begun serving his sentence on the underlying offense; (2) the jury was erroneously permitted to use his attempted murder conviction to find his specific intent to inflict great bodily injury; (3) the court improperly instructed that the great bodily injury could be based on aggravation of the relatively minor initial injury by postshooting medical treatment; (4) the court improperly defined great bodily injury; and (5) the court erroneously denied his request for a continuance when he was subjected to multiple court-ordered transfers between jail and prison, the jail lost all his accumulated trial materials, he was deprived of any meaningful access to his assigned legal assistant, and the trial transcript of the victim's treating physicians' testimony at the first trial was never provided to permit him to prepare for cross-examination at the second trial.

Because the People concede it was error to convict Schulz of both possessing a combustible substance (§ 453, subd. (a)) and possessing a

---

[1]All statutory references are to the Penal Code unless otherwise specified.

9firebomb (§ 453, subd. (b)), we do not address this issue further. For the following reasons, we affirm the judgment in case No. D012033 as modified, but reverse the judgment in case No. D013364, and deny the writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

We briefly summarize the facts from this lengthy trial, expanding on them as necessary during our analysis below.

Schulz, an engineer, shot the ex-husband (John) of a woman (Janice) he had been dating. During the course of their romantic relationship, Schulz and Janice jointly purchased a home for Janice to live in. When Janice broke off the relationship stating she still loved her ex-husband, she agreed to refund Schulz's money used for the purchase of the house.

According to John, on October 29, 1985, Schulz, who was appeared at his house claiming he had a package for him. When he opened the door, Schulz shot him with a gun hidden in a box. He fled into the house with Schulz following with the gun aimed at him. The gun jammed, Schulz left the house, and John called 911.

Thirty minutes later, a deputy sheriff stopped Schulz, who was driving a rental car with its license plate partially covered with cardboard. A gun found in the car was jammed with a bullet in the chamber. On the backseat, there was a box with a pillow inside and with a bullet hole at the end, characterized by the deputy sheriff as a homemade gun silencer.[2]

John stated he had never met or talked to Schulz before the shooting. Beginning three days before the shooting, John had been receiving annoying hang-up and cursing phone calls from an unknown caller. Schulz's telephone bill showed 17 telephone calls to John's number during that time period, some during the early morning hours.

Schulz claimed John had called and invited him to his home to talk about Janice, and he fired the gun only after John struck him to the ground and was leaning over him. Schulz claims he pulled back the hammer and shot John from a reclining position, but never followed him into the house when he fled. Instead, Schulz picked up personal items which had fallen from the box where the gun had been placed, and sped away because he was afraid John had retrieved a weapon inside the house.

---

[2]Two bottles filled with gasoline, two linen strips, a towel, and a pair of plastic gloves were also found in the rental car; and a Bic lighter was found in the patrol car where Schulz had been seated.

The bullet entered and exited John's body, penetrating fatty tissue and ricocheting off abdominal muscles without penetrating the abdomen. The treating trauma surgeon, Dr. Savin, opened the wound from entrance to exit, in order to clean out the wound to prevent infection, and to check if the wound had penetrated the abdomen, leaving a 10-inch scar and resulting in a 12-day hospital stay.

At the first trial resulting in a hung jury on the great bodily injury enhancement, a forensic pathologist (Dr. Guard) testified for the defense the wound was minor and superficial, since it did not penetrate the abdomen and could have been treated merely by dressing and covering it. However, he stated Dr. Savin's surgery was appropriate to clean out the injured fatty tissue, to determine the extent of interior damage, to prevent infection and to speed healing. At the second trial where the jury found the great bodily injury allegation to be true, Dr. Guard did not testify.

CASE NO. D012033*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

CASE NO. D013364

A.

Schulz next argues it was improper to retry the great bodily injury enhancement separately from the attempted murder count, pointing out the enhancement and the offense require adjudication of the same facts and the enhancement is not a distinct offense, but an added punishment. He contends when the jury hung on the enhancement, the prosecution should have been given the choice of either accepting the attempted murder verdict and requesting dismissal of the enhancement, or requesting a mistrial as to the attempted murder count as well and retrying both the attempted murder charge and its enhancement. Further, he asserts that since, based on the attempted murder conviction, he had begun serving his sentence and an appeal had been filed, the trial court was without jurisdiction to render the modified judgment based on the enhancement.

A similar argument has been rejected in the context of a trial which results in a conviction of one offense and a hung jury on another. Section 1160 expressly allows a retrial of charged offenses as to which the jury cannot

*See footnote, *ante*, page 563.

reach a verdict.[15] In *People* v. *Culton* (1979) 92 Cal.App.3d 113 [154 Cal.Rptr. 672], the defendant argued that section 654 precluded further trial on rape and robbery counts after he had been sentenced on a jury verdict finding him guilty of felonious assault. Rejecting the argument, the court stated:

"The judgment pronounced on the first verdict was preliminary in nature, and was subject to modification. When all counts had been disposed of, in order for the court to pronounce a judgment which avoided double punishment, the court did appropriately stay the assault count to meet the requirements of section 654. In accepting the verdict on the assault count and then impanelling a new jury to try the two counts on which there had been jury disagreement, the court proceeded in compliance with the applicable statute (see Pen. Code, § 1160)." (92 Cal.App.3d at p. 117.)

■ There is no statutory provision directly addressing retrial of an enhancement following conviction and sentencing on the offense underlying the enhancement. Schulz argues that since the enhancement is not a distinct offense but rather merely increased punishment based on circumstances of the offense,[16] it cannot be tried separately after a jury fails to reach a verdict on the enhancement. Jeopardy does not attach solely from the fact of a mistrial, and a defendant may be retried until complete and final disposition is made of all charges. (*People* v. *Rojas* (1975) 15 Cal.3d 540, 545-546 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127]; *People* v. *Allen* (1974) 41 Cal.App.3d 821, 825 [116 Cal.Rptr. 493].) We conclude there is no legal or practical barrier to continued prosecution of an enhancement before a second jury where jeopardy is not a bar.

Schulz cites decisions in which courts refused to remand for further jury trial on an enhancement in circumstances where the prosecution was deemed to have waived the charge by failing to request proper jury instructions pertaining to the enhancement. (*People* v. *Najera* (1972) 8 Cal.3d 504, 509-511 [105 Cal.Rptr. 345, 503 P.2d 1353]; *People* v. *Spencer* (1972) 22 Cal.App.3d 786, 801-802 [99 Cal.Rptr. 681].) The courts reasoned:

"[S]uch a [remand] procedure would constitute a 'piecemeal trial' requiring 'the impanelment of a new and different jury and a trial in which the admissible evidence bearing upon the limited issue would be practically

---

[15]Section 1160 states in part: "Where two or more offenses are charged in any accusatory pleading, if the jury cannot agree upon a verdict as to all of them, they may render a verdict as to the charge or charges upon which they do agree, and the charges on which they do not agree may be tried again."

[16]See *People* v. *Smith* (1985) 163 Cal.App.3d 908, 913-914 [210 Cal.Rptr. 43] (§ 654 [stay of offense requires corresponding stay of enhancement]).

coextensive with that received at the plenary trial. . . . [Par.] It is our conclusion that the practical realities of the situation, combined with the valid arguments of appellant in opposition to an unprecedented bifurcation of a jury trial for the purpose of determining the limited issue of penalty, dictate the rejection of that procedure in the circumstances of this case. *It seems not unreasonable to hold that the failure of the prosecution to request either the necessary jury instruction or the submission of the requisite special verdict should be taken as an indication that [the enhancement] has not been invoked.'* " (*People* v. *Najera, supra,* 8 Cal.3d at pp. 510-511, original italics, quoting *People* v. *Spencer, supra,* 22 Cal.App.3d at p. 802.)

Unlike the facts in *Najera* and *Spencer,* Schulz's first jury was properly presented with the enhancement issue, but could not reach a unanimous verdict. In *Najera,* the decision not to remand was a policy determination it was unfair to allow piecemeal trials of enhancements after reversal on appeal based on prosecutorial error. (*People* v. *Najera, supra,* 8 Cal.3d at pp. 511-512.) In contrast, where a retrial is based solely on a hung jury there is no such policy consideration and principles of waiver do not apply.

## B.

■ Schulz contends the retrial was beyond the trial court's jurisdiction during the pendency of his appeal in case No. D012033.

*People* v. *Perez* (1979) 23 Cal.3d 545, 554 [591 P.2d 63], notes the general rule that "filing of a valid notice of appeal vests jurisdiction of the cause in the appellate court until determination of the appeal and issuance of the remittitur. [Citations.]" However, that decision concludes that since it was in any event reversing for resentencing, it did not need to determine whether in the case before it, this rule precluded the trial court from amending the judgment during the pendency of the appeal.[17] Ordinarily the trial court loses jurisdiction after the filing of an appeal over anything "which may affect the judgment." (*People* v. *Getty* (1975) 50 Cal.App.3d 101, 107 [123 Cal.Rptr. 704].)

An exception to this loss of jurisdiction is recognized as to matters that are collateral or supplemental to the questions involved on the appeal. (See, e.g., *In re Baker* (1988) 206 Cal.App.3d 493, 498-499 [253 Cal.Rptr. 615] [trial court may proceed with writ of habeas corpus petition premised on facts

---

[17]In *Perez,* the trial court amended the judgment to provide that the sentence imposed should run consecutively with any other sentences the defendant was serving. The amendment was authorized under section 669, which allows the court, within 60 days after commencement of imprisonment, to determine how a sentence shall run in relationship to prior sentences. (*People* v. *Perez, supra,* 23 Cal.3d at pp. 548, 554, & fn. 7.)

which did not appear on face of appellate record]; see generally, *People* v. *Hall* (1952) 115 Cal.App.2d 144, 154-156 [251 P.2d 979]; cf. Code Civ. Proc., § 916 [after filing of appeal, trial court may proceed upon any other matter embraced in action and not affected by judgment or order].)

Based on this exception, we conclude the trial court had jurisdiction to retry and sentence the great bodily injury enhancement, since its resolution would have no direct impact on the validity of the guilty verdict and sentence for the attempted murder charge pending on appeal. Moreover, proceeding with a retrial and second sentencing notwithstanding a pending appeal is impliedly authorized by section 1160, which allows for retrial after a hung jury mistrial. Although the second sentence may require, for example, a staying of portions of the first (as occurred here and in the *Culton* case), this does not create conflicting jurisdictions between the appellate and trial courts. Rather, assuming successive appeals are filed after each sentence, the appellate court can give effect to the second sentence which is in actuality the "final" sentence. (Cf. *In re Baker, supra,* 206 Cal.App.3d at pp. 496, 500.)

## C.

Schulz argues the trial court abused its discretion in denying his request for a continuance made on the day of the great bodily injury enhancement trial, August 13, 1990.

### Schulz's Declarations

Schulz submitted declarations to the trial court, stating as follows.[18] After he was notified on May 3, 1990, that the prosecution would retry the great bodily injury enhancement, he contacted Dr. Guard whose expert testimony at the previous trial was that the gunshot injury was minor. He also began a search for an expert and information on the proper treatment of gunshot wounds, and he placed a list identifying his contacts and substantial accumulated research in a file box combined with his materials from the first trial. On May 21, 1990, he was transferred from county jail to Donovan State Prison and deprived of his propria persona privileges. While at Donovan State Prison, he had no access to his legal files, to a telephone to contact potential witnesses, to writing materials, or to law books.

On May 25, 1990, he was sent back to county jail, but was not placed in the propria persona unit, and was not allowed to retain his legal files, and

---

[18]Schulz submitted the declarations in support of an unsuccessful motion to dismiss for outrageous conduct. When the motion was denied, he orally requested a continuance.

had no access to telephones. It was not until June 22, 1990, that the court, at his insistence, ordered his propria persona privileges reinstated. However, they were not fully restored until July 16, 1990.

On July 10, 1990, Schulz had appeared at a hearing and requested a continuance and a request for transcripts from the previous trial of the two witnesses (John and the treating physician, Dr. Savin) the prosecution intended to call at the enhancement trial. Schulz informed the court he again intended to call the defense forensic pathologist, Dr. Guard. Schulz's assisting law clerk told the court the jail finally had given Schulz permission to have his file from the previous trial brought out of storage with the county defender's office and into the attorney's room at the jail for perusal. The trial judge continued the trial until August 13, 1990, to allow the court reporter time to prepare the transcript of the first trial.

On July 16, 1990, Schulz was placed in a propria persona cell and began reassembling his trial file. His defense theory was to show the wound was minor and superficial and Dr. Savin had performed unnecessary surgery. He intended to impeach John and Dr. Savin based on the medical literature and other information he had accumulated, and to call the forensic pathologist Dr. Guard and an as-yet-undetermined surgical specialist on gunshot wound treatment. His file box contained his notes taken during John's and Dr. Savin's testimony during the previous trial, a copy of Dr. Savin's hospital report, employment records showing John's time off from work, articles describing the nature and treatment of gunshot wounds, photographs of similar types of gunshot wounds before and after treatment (not entered into evidence at the first trial), contact information pertaining to the two expert witnesses he intended to call, a list of jury voir dire questions, and research notes pertaining to trial motions and jury instructions. His trial preparations were interrupted three days later when a different judge ordered him transferred back to Donovan State Prison without prior notice. Once there, he was denied access to resources necessary to prepare the case. He had no access to his legal files, which remained in San Diego, no access to law books, no access to a telephone to contact witness, and no access to the court for appointment of his second expert. He was returned to county jail on August 10, 1990, but was not placed in the propria persona unit and was denied access to all necessary resources, including his file box, which the jail authorities could not find.

Schulz's law clerk filed a supporting declaration, asserting he had unsuccessfully asked the court to return Schulz to county jail to allow him to prepare for trial. The law clerk's supervisor at the alternate defender's office refused to permit him to visit Schulz at Donovan State Prison on the

assumption Schulz was in state custody and out of the alternate defender's office jurisdiction. The law clerk did not see Schulz from July 12, 1990, until his return to county jail on August 10, 1990, at which time it was learned the jail could not locate the legal materials he had been forced to leave upon his unannounced 2 a.m. transfer to Donovan State Prison.

On the day of trial, no reporter's transcript of Dr. Savin's testimony at the earlier trial had been provided and Schulz asked the court for another continuance to prepare for trial based on the uncontradicted facts in the above declarations. The trial court denied the request, noting Schulz had a law clerk assisting him and the case had already been continued to allow him to prepare.

■ A court has broad discretion to grant or deny a motion for continuance of trial and a request may properly be denied where defendants cannot show reasonable diligence in preparing for trial. (*People* v. *Grant* (1988) 45 Cal.3d 829, 844 [248 Cal.Rptr. 444, 755 P.2d 894].) However, to paraphrase language in *Ungar* v. *Sarafite* (1964) 376 U.S. 575, 589 [11 L.Ed.2d 921, 931,84 S.Ct. 841], "a myopic insistence upon expeditiousness in the face of ajustifi-able request for delay can render the right to defend . . . an empty formality." ■ Here, the trial court received unrebutted declarations establishing an almost continuous denial of Schulz's propria persona privileges during the period between the People's election to retry him on the great bodily injury enhancement and the date of trial. Except for few intervals when he was present in the county jail, Schulz was prevented from accessing the extensive materials in his "trial box" and his appointed law clerk could not communicate with him. Three days before trial Schulz was returned to San Diego only to find the county had lost his "trial box." An inventory of the lost materials appended to this decision is noteworthy both because of the breadth of the materials compiled and the direct relevance of many items to presenting an adequate defense. The lack of telephone and other propria persona privileges while Schulz was removed from county jail was without apparent justification. The People do not suggest otherwise, nor do they contradict the law clerk's declaration showing his inability to meaningfully assist Schulz was precluded by the court-ordered removals.

There is no doubt Schulz was diligent in his attempts to prepare his defense. He protested the removal of his propria persona privileges at every opportunity and timely requested Dr. Savin's trial transcript. Through no fault of his own, he never received the transcript reasonably necessary to prepare to impeach Dr. Savin; his defense materials were lost by jail personnel and the court prevented him from having meaningful propria persona privileges through apparently arbitrary removal to state prison three days after his full propria persona privileges had been restored.

Finally, the People have not shown how a further reasonable trial continuance would have been prejudicial. The People's case took approximately four hours to present, consisting only of testimony from John and Dr. Savin. The court cited no potential prejudice when it denied the continuance. On these facts, we are satisfied Schulz was denied the procedural due process to which he was entitled to prepare his defense. The error is prejudicial per se and requires reversal. (See *People* v. *Maddox* (1967) 67 Cal.2d 647, 655 [63 Cal.Rptr. 371, 433 P.2d 163].)[19]

## DISPOSITION

The judgment in case No. D012033 is modified by striking the conviction for possessing a firebomb or combustible substance and, as modified, is affirmed. (§ 453, subd. (b).) The judgment in case No. D013364 is reversed. The writ petition is denied. The matter is remanded to the superior court with directions to reinstate the sentence imposed in case No. D012033 as modified by striking the stayed sentence for violation of section 453, subdivision (b).

Kremer, P. J., and Benke, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 25, 1992. Mosk, J., was of the opinion that the petition should be granted.

---

[19]Our disposition makes it unnecessary to address several substantial issues Schulz raises related to proceedings during his enhancement trial.