39 F.3d 1182
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Narciso IBARRA, Defendant-Appellant.
 No. 93-3810.
 United States Court of Appeals, Sixth Circuit.
 Oct. 31, 1994.
 
 Before: KENNEDY and JONES, Circuit Judges; and DEMASCIO,* District Judge.
 PER CURIAM.
 
 
 1
 A jury convicted defendant, Narciso Ibarra, on one count of conspiracy to possess and distribute marijuana, in violation of 21 U.S.C. Sec. 846, and on three counts of unlawful use of a communication facility, in violation of 21 U.S.C. Sec. 843(b). Defendant appeals his conviction, raising three assignments of error: whether sufficient evidence exists to support his conviction, whether the District Court erred in denying his motion for a continuance, and whether the District Court erred in refusing to issue subpoenas for five witnesses. We affirm.
 
 I.
 
 2
 In 1989, the Toledo Metro Drug Task Force began investigating a drug trafficking ring that was locally controlled by Leo Casares. This ring imported marijuana from Texas and Mexico to Ohio and then distributed it throughout northwest Ohio. As part of its investigation, the Task Force obtained permission to place a wiretap on Casares' home phone from January 7, 1991 through March 6, 1991.
 
 
 3
 The wiretap intercepted over 2700 calls, and defendant was the fifth most frequently called person during the duration of the wiretap. On several occasions, defendant told Casares that he was coming to Casares' house to get "more paint" or that he was travelling to other locations to obtain "paint." William Glynn, a co-conspirator who cooperated with the government, testified that "paint" was a code word for marijuana.
 
 
 4
 Glynn also testified that on one occasion, he and several other people, including defendant, were at Danny Jaso's house waiting for Bill Cramer to depart for Texas to pick up a load of marijuana. Glynn testified that all the people present on that occasion worked for Leo Casares' drug ring in some capacity. Cramer's primary role was to act as Casares' driver and gopher, handling the pickups and deliveries of drugs and cash. After Casares became suspicious of Cramer, he moved defendant into Cramer's role.
 
 
 5
 On November 30, 1990, Casares' wife transferred $1550 to defendant through Western Union. Defendant signed for the transfer at one of Western Union's offices in south Texas. The Western Union office was located near one of the source cities for marijuana used by the Casares organization.
 
 
 6
 Gary Krupinski, another co-conspirator who cooperated with the government, testified as to another occasion when people from the Casares organization gathered at Jaso's house. This time, they gathered to receive a load of marijuana that had just arrived from Texas. Krupinski testified that Casares told him defendant had transported the load. Krupinski also stated that he personally saw defendant at Jaso's house on this occasion. Finally, Krupinski also testified that Casares told him that defendant delivered drugs and picked up cash payments for Casares.
 
 
 7
 On November 7, 1991, a grand jury issued a multi-count, multi-defendant indictment concerning the Casares drug organization. Count one of that indictment charged defendant, along with the other members of the organization, with conspiracy to possess marijuana with the intent to distribute, a violation of 21 U.S.C. Sec. 841. Counts eight, ten, and eighteen charged defendant with unlawful use of a communication facility, specifically a telephone, in violation of 21 U.S.C. Sec. 843(b).
 
 
 8
 The trial of defendant and several of his co-conspirators began September 2, 1992. After several weeks of trial, the jury began deliberating on October 22, 1992. On October 28, 1992, the jury reported that it could not reach a verdict regarding defendant on any of the four counts. Defendant's second trial began April 20, 1993, after which a jury found him guilty on all counts. Defendant now appeals his conviction.
 
 II.
 A. Sufficiency of the Evidence
 
 9
 Defendant argues that the prosecution did not present sufficient proof to support his conviction. With respect to the conspiracy charge, he contends that the only direct evidence provided at trial came from the testimony of two co-conspirators who cooperated with the government. According to defendant, this cooperation casts doubt on Glynn's and Krupinski's credibility. Defendant also notes that a search of his residence found no drugs or other indicia of drug trafficking.
 
 
 10
 As the above discussion of the facts makes clear, the testimony of Glynn and Krupinski, when coupled with the tape recordings of the wiretapped conversations, constitutes sufficient evidence to support Defendant's section 846 conviction. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986). Glynn and Krupinski's credibility is a matter for the jury, which obviously found against defendant on this issue.
 
 
 11
 As for the three section 843(b) counts, the telephone conversations intercepted through the wiretap clearly fulfill the requirements for unlawful use of a communication facility. See 21 U.S.C. Sec. 843(b).
 
 B. Denial of Motion for Continuance
 
 12
 The jury in defendant's first trial was unable to reach a verdict as to him, although it convicted other co-conspirators. Defendant's second trial was originally scheduled for March 16, 1993. On March 10, however, the District Court granted defense counsel's motion to withdraw and appointed new counsel for defendant. In conjunction with this ruling, the District Court also vacated the March 16 trial date. The trial was later rescheduled for April 20, 1993.
 
 
 13
 Before voir dire began on April 20, the District Court heard argument on several motions filed by defendant. One of these was a motion for a second continuance. Defendant's attorney informed the court that the continuance was necessary to permit him to locate and interview several possible character witnesses. No explanation was given for why these witnesses were not interviewed earlier, except that one had proven difficult to locate and defendant had provided his attorney with the three other names only that morning.
 
 
 14
 The court denied the motion, stating that trial was scheduled to last approximately a week, which would give defense counsel ample time to locate and interview these witnesses during the late afternoon and evening hours. The District Court also noted that the case had already been tried once, that potential jurors were at the courthouse waiting for voir dire, and that ample time had been allowed for preparation.
 
 
 15
 In the final pre-trial motion, defense counsel, Sam Eidy, requested permission to withdraw. Eidy informed the court that he was ready to proceed, but that defendant had no confidence in his ability to provide adequate representation. Defendant had the same problem with Eidy that he had with his two prior attorneys: all three encouraged him to accept the plea bargain offered by the government.
 
 
 16
 The court informed defendant that it would not appoint him a fourth attorney, as all three of his attorneys had been competent. Faced with this decision, defendant requested that he be allowed to represent himself. After discussions with defendant, Eidy, and the prosecuting attorney, the District Court granted defendant's request, although it did appoint Eidy to be stand-by counsel. On appeal, defendant now argues that the District Court should have granted him a continuance to allow him to properly prepare to represent himself. Defendant also asserts that the continuance would have allowed him time to interview and subpoena necessary witnesses.
 
 
 17
 We first note that this allegation of error actually breaks into two subparts: whether the District Court erred in denying defendant's motion for a continuance, and whether the District Court should have sua sponte granted defendant a continuance once defendant chose to represent himself. The Supreme Court has declared that "[t]he matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel...." Ungar v. Sarafite, 376 U.S. 575, 589 (1964) (citations omitted). In determining whether a continuance was warranted in a particular case, a court should examine "the length of delay, previous continuances, inconvenience to litigants, witnesses, counsel and the court, whether the delay is purposeful or is caused by the accused, the availability of other competent counsel, the complexity of the case, and whether denying the continuance will lead to identifiable prejudice. "Wilson v. Mintzes, 761 F.2d 275, 281 (6th Cir.1985).
 
 
 18
 The District Court did not abuse its discretion in denying defendant's motion for a continuance. Defendant did not request the continuance in order to gather more evidence or explore new leads. Instead, he wanted the extra time to interview potential character witnesses. This case had already been tried once, and the second trial was continued once. We also note that defendant was not in custody; he had been released on bond. Thus, he had ample opportunity to locate and interview these witnesses during the seven days between the start of his second trial and the beginning of the defense presentation.
 
 
 19
 We also hold that the District Court did not commit plain error in failing to sua sponte grant defendant a continuance after he opted to represent himself. Defendant had already been through one trial on these charges, and his attorney had already performed the pre-trial work necessary for the second trial. Defendant contends that he was prejudiced by the District Court's refusal to allow a continuance so he could interview several co-conspirators whom he wished to call as witnesses. This argument is intertwined with the next issue. As we discuss there, the District Court did not err in refusing to issue the subpoenas. Defendant has not shown that either the refusal to issue the subpoenas or the refusal to grant a continuance prejudiced him.
 
 C. Refusal to Issue Subpoenas
 
 20
 After the prosecution rested its case at the second trial, defendant moved the court to issue several subpoenas. While the District Court did accommodate some of defendant's requests, it refused to issue subpoenas for Danny Jaso, Santiago Cantu, Mike Cantu, Uhrico Cadena, and Carlos Medrano. All five of these men were co-conspirators with defendant, and all but Medrano were serving federal sentences for their roles in the conspiracy. Medrano was acquitted on federal charges, but was facing several charges brought by the state of Texas.
 
 
 21
 In arguing against the necessity of these potential witnesses, the prosecution noted that Jaso had testified for the prosecution at defendant's first trial and had provided testimony consistent with Glynn's testimony at the second trial. In addition, Santiago Cantu had taken the stand in his own defense at the first trial and provided no exculpatory evidence regarding defendant.
 
 
 22
 When asked why he needed these witnesses, defendant was unable to provide any summary of the men's anticipated testimony. Defendant also said that he did not need to interview these men, but could just put them on the stand and have them "tell the truth." He did not, however, say what this "truth" was.
 
 
 23
 A district court's refusal to issue a subpoena under Fed.R.Crim.P. 17(b) is reviewed for an abuse of discretion, and we will not reverse such a ruling unless it jeopardized the defendant's right to a complete, fair, and adequate trial. United States v. Moore, 917 F.2d 215, 230 (6th Cir.1990), cert. denied, 499 U.S. 963 (1991). Before a district court may issue such a subpoena, the defendant must make a preliminary showing that a particular witness is necessary, that is, the witness will provide information that is "relevant, material and useful to an adequate defense." Id.; see also United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982).
 
 
 24
 All five potential witnesses were co-conspirators with defendant. Defendant had an obligation to provide the District Court with some preliminary showing as to why the testimony of these men was necessary to his case; he was required to do more than say that the men would testify as to "the truth." Defendant did not need to interview the men to make this showing. Without such a showing, the District Court had no basis to determine whether the witnesses were necessary. Thus, it did not err in refusing to issue the subpoenas.
 
 IV.
 
 25
 We AFFIRM the judgment of the District Court.
 
 
 
 *
 The Honorable Robert E. DeMascio, United States District Judge for the Eastern District of Michigan, sitting by designation