[Cite as *State v. Watkins*, 2012-Ohio-4279.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

## JOURNAL ENTRY AND OPINION
### No. 97783

---

## STATE OF OHIO

### PLAINTIFF-APPELLEE

vs.

## DALONTE L. WATKINS

### DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-549984

**BEFORE:**  Kilbane, J., Rocco, P.J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:**  September 20, 2012

**ATTORNEY FOR APPELLANT**

Mark R. Marshall
P.O. Box 451146
Westlake, Ohio 44145

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
Mark J. Mahoney
Assistant County Prosecutor
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, J.:

{¶1} Defendant-appellant, Dalonte Watkins ("Watkins"), appeals his burglary conviction. Finding no merit to the appeal, we affirm.

{¶2} In May 2011, Watkins was charged in a five-count indictment. Count 1 charged him with burglary, Count 2 charged him with theft, Count 3 charged him with vandalism, Count 4 charged him with possessing criminal tools and carried a furthermore clause, and Count 5 charged him with criminal damaging. The indictment identified Jillian Edgell ("Edgell") as the victim. In December 2011, the matter proceeded to a jury trial, at which the following evidence was adduced.

{¶3} At approximately 2:45 a.m. on April 28, 2011, Lakewood police officers, Patrick Mullen ("Mullen") and Kevin Jones ("Jones"), responded to a call that two males dressed in dark clothing were riding bicycles and looking into cars on Lakeland Avenue in Lakewood, Ohio. When the officers arrived on scene, they observed both males carrying duffle bags and riding bicycles in the middle of the street. Mullen stopped his police cruiser right next to one of the males, whom he later identified as Watkins. He instructed Watkins to stop and asked to speak with him. Watkins got off the bicycle and placed the two duffle bags he was carrying on the ground. As Mullen exited his vehicle to approach Watkins, Watkins ran away. Mullen pursued him through the yards of the

homes on Lakeland Avenue. While chasing after Watkins, Mullen got caught on a fence and was unable to apprehend him.

{¶4} Meanwhile, Jones stopped the other male, later identified as P.T. Jones exited his police cruiser and ran after P.T. Jones grabbed P.T. off the bicycle and began to question him. P.T. was carrying one duffle bag. The bag was open and Jones observed some video games inside the bag. When Jones asked P.T. who the video games belonged to, he "fumbled over his words" and replied, "oh, this is my cousin's stuff." Jones then heard Mullen radio for assistance, so he placed P.T. under arrest for a curfew violation and assisted Mullen with the search for Watkins.[1]

{¶5} The police found toy handcuffs, a Nintendo Wii game console, three Nintendo Wii game controllers, three Nintendo Wii video games, a PlayStation 3 game console, Sharpie markers, and a silver hammer in the bag P.T. was carrying. The police also found a flashlight, a lighter, a glass pipe used to smoke marijuana, two Nintendo Wii game controllers, a faceplate from a car stereo, a diamond bracelet, a pair of diamond earrings, and two gold rings in P.T.'s pockets. In the bags carried by Watkins, the officers found a laptop, MP3 player, several pairs of sunglasses, an Xbox 360 game console, and some video games.

{¶6} P.T. told the officers that the property came from a house located at 1503 Lakeland Avenue, which was approximately six houses from where Watkins and P.T. were stopped by the police. When the officers arrived at the 1503 Lakeland Avenue,

---

[1]P.T. was 17 years old at the time of the incident.

which is Edgell's residence, they observed a vehicle in the driveway with a broken window. They also observed that the back door was forced open with the glass broken out of it. On the inside, the house was in complete disarray, with cabinets thrown to the floor, broken glass, and clothes everywhere. While the officers were inside, Raymond Metz ("Metz"), Edgell's grandfather, arrived at the house. Metz was looking after the house while Edgell was on vacation with her children and her sister, Ashley Edgell ("Ashley"). He advised the police that Edgell called him and asked him to check on the house.

{¶7} Edgell asked her grandfather to check on the house because Ashley received a call sometime between 2:00 a.m. to 3:00 a.m. from her nephew's cell phone, which Edgell left at home. They suspected Watkins was the person who called from the cell phone. Watkins and Ashley had previously dated for three years. During that time, Watkins had been at Edgell's house several times. Ashley and Watkins would babysit Edgell's children and sometimes Watkins would spend the night at her house. Ashley told Watkins that Edgell and her family were going on vacation. However, shortly before leaving for vacation, Ashley and Watkins ended their relationship.

{¶8} After his arrest, P.T. was transported to the Lakewood Police Department. P.T. told the police that he and Watkins broke into Edgell's home and stole various items. P.T. testified that he met Watkins through his cousin, who was Watkins's girlfriend at the time of trial. P.T. further testified that Watkins called him and asked to meet him at the corner store on West 85th Street in Cleveland. Watkins told P.T. that they were

going to rob a house in Lakewood. P.T. testified that when they got to the house, which P.T. later found out was Edgell's residence, Watkins used a key to get into the door. Watkins later broke the glass on the door to make it look like a robbery. Once inside, P.T. and Watkins went their separate ways and began stealing various items. P.T. testified that he broke the window of Edgell's car with a hammer he took from inside the house. After approximately 20 minutes, they left the house and took off on two bicycles that were in the garage. As they started riding the bicycles down the street, they were stopped by Mullen and Jones.

{¶9} At the conclusion of trial, the jury found Watkins guilty of all counts. The trial court merged Counts 1 and 2 for purposes of sentencing and sentenced Watkins to three years in prison on Count 1, one year in prison on each of Counts 3 and 4, and 60 days in jail on Count 5. The court ordered that all counts be served concurrently to each other, for an aggregate of three years in prison.

{¶10} Watkins now appeals, raising the following three assignments of error for review.

## ASSIGNMENT OF ERROR ONE

[Watkins's] conviction for burglary (F-2) in violation of [R.C. 2911.12(A)(2)] is contrary to the manifest weight of the evidence as the state of Ohio failed to establish beyond a reasonable doubt that [Watkins] trespassed in an occupied structure when another person other than an accomplice was present or likely to be present.

## ASSIGNMENT OF ERROR TWO

The state of Ohio failed to establish beyond a reasonable doubt when viewed by the manifest weight of the evidence that [Watkins] either

participated or was an accomplice in the burglary at the 1503 Lakeland Avenue residence.

## ASSIGNMENT OF ERROR THREE

The trial court abused its discretion by refusing to grant a request for a continuance of the trial date in order for [Watkins] to authenticate a text message intended to be used by [him] for impeachment of [P.T.].

## Manifest Weight

{¶11} In the first and second assignment of error, Watkins argues his burglary conviction is against the manifest weight of the evidence. With regard to a manifest weight challenge:

> [the] reviewing court asks whose evidence is more persuasive — the state's or the defendant's? * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. [*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997)], citing [*Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982)].

*State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

{¶12} Moreover, an appellate court may not merely substitute its view for that of the jury, but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶13} In the instant case, Watkins was convicted of burglary under R.C. 2911.12(A)(2), which provides in pertinent part: "[n]o person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense[.]"

{¶14} Watkins first argues that the jury's finding that a "person other than an accomplice of the offender * * * likely to be present" was against the manifest weight of the evidence because Edgell was on vacation at the time of the burglary. We note that in determining whether persons are likely to be present under R.C. 2911.12(A)(2), what the defendant knows at the time is irrelevant; rather, the issue is whether it was objectively likely that persons were likely to be there. *State v. Dewitt*, 3d Dist. No. 1-09-25, 2009-Ohio-5903; *State v. Pennington*, 12th Dist. No. CA2006-11-136, 2007-Ohio-6572. "[A] person is likely to be present when a consideration of all the circumstances would seem to justify a logical expectation that a person could be present." *State v. Cantin*, 132 Ohio App.3d 808, 813, 726 N.E.2d 565 (8th Dist.1999), citing *State v. Green*, 18 Ohio App.3d 69, 480 N.E.2d 1128 (10th Dist.1984).

{¶15} Typically, where a burglary occurs and the occupying family is temporarily absent, a showing that the occupied structure is a permanent dwelling, which is regularly inhabited and the occupants were in and out on the day in question, will be sufficient evidence to support a conviction for burglary. *State v. Kilby*, 50 Ohio St.2d 21, 25, 361

N.E.2d 1336 (1977). However, this court and other Ohio courts have found that if the occupants of the dwelling are on vacation, and there is evidence that the occupants have given a neighbor or other caretaker permission or access to the home regularly, then there will be sufficient evidence that a person is "likely to be present" for purposes of R.C. 2911.12(A)(2), a second degree felony burglary offense. *See State v. Cochran*, 8th Dist. No. 50057, 1986 Ohio App. LEXIS 5481 (Jan. 30, 1986); *State v. Robinson*, 8th Dist. Nos. 49501, 49518, and 49577, 1985 Ohio App. LEXIS 9055 (Oct. 24, 1985) (a "person other than an accomplice of the offender is * * * likely to be present" when the homeowner or occupant was away on vacation, but had given keys to a neighbor to check on the house periodically). *See also Dewitt*; *Pennington*.

**{¶16}** Here, Edgell testified that she asked Metz to periodically check on her house while she was on vacation for six days and that Metz had just checked on her house the day before the burglary. Edgell further testified that because Metz was responsible for checking on her house, she asked him to go to the house when they received the call from her son's cellphone. Based on this evidence, we do not find that the jury clearly lost its way in finding that the "likely to be present" element in R.C. 2911.12(A)(2) was met.

**{¶17}** Watkins next argues that his burglary conviction is against the manifest weight of the evidence because P.T.'s testimony that Watkins was involved in the burglary was not credible. Specifically, he refers to P.T.'s testimony that: (1) Watkins used a key located at the top of the back door to gain entry into the house, but Edgell testified that she did not have a spare key outside and (2) he discussed the burglary with

his cousin, who was Watkins's girlfriend, and acknowledged that Watkins was not involved.

{¶18} We recognize that:

> [t]he determination of weight and credibility of the evidence is for the trier of fact. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses testimony is credible. As such, the trier of fact is free to believe or disbelieve all or any of the testimony. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility. (Citations omitted.)

*State v. Montgomery*, 8th Dist. No. 95700, 2011-Ohio-3259, ¶ 10, quoting *State v. Blackman*, 8th Dist. No. 95168, 2011-Ohio-2262, ¶ 21.

{¶19} Upon review, we do not find that the jury clearly lost its way in assessing P.T.'s testimony. When the prosecutor asked P.T. if he observed Watkins grab the key from the top of the door, he replied "[n]o, but I seen the key there. I didn't see him grab it from there, but I seen the key when I got there." He further testified that Watkins broke the glass on the door "[t]o — make it look like a robbery." With regard to P.T.'s conversation with his cousin, P.T. acknowledged that he did not correct his cousin when she said Watkins was not involved. P.T. testified that he just said what she wanted to hear and responded "uh-huh." He "told her that because [he] knew that she was going to be right behind [Watkins's] butt, the whole way. So [he] told her what she wanted to hear. It wasn't to make [himself] look good." Thus, we cannot say the jury clearly lost

its way and created such a manifest miscarriage of justice that Watkins's conviction must be reversed and a new trial ordered.

{¶20} Accordingly, the first and second assignments of error are overruled.

Motion for Continuance

{¶21} In the third assignment of error, Watkins argues the trial court abused its discretion when it denied his motion for a continuance in order to authenticate a text message intended to impeach P.T.'s testimony.

{¶22} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. [Thus, an] appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981), citing *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *State v. Bayless*, 48 Ohio St.2d 73, 101, 357 N.E.2d 1035 (1976). An abuse of discretion "'implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980).

{¶23} The Ohio Supreme Court has stated that the following facts can be considered when determining whether a continuance should have been granted: "the length of delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors." *State v. Landrum*, 53 Ohio St.3d 107, 115, 559 N.E.2d 710 (1990).

{¶24} In the instant case, Watkins's defense counsel advised the trial court that Watkins received a text message from P.T. on December 2, 2011. However, Watkins did not advise his counsel of the text message until the day before trial on December 13, 2011. Defense counsel informed the prosecutor about the text the same day, but did not inform the trial court until the next day, which was the first day of trial. Defense counsel requested a continuance of eight to ten days so that the text message could be authenticated by the cellphone carrier. The trial court denied Watkins's motion for continuance, stating that:

> I allowed you to ask [P.T.] about if there was any communication between him and [Watkins]. * * * [T]his case had been going on a long time * * * [a]nd * * * has been continued [eight times.]" * * * It was set for trial July 18th. It was continued. And then it was set for trial on August 2nd, and it was continued. Then it was set for August 22nd, and it was continued. It was set for August 31st, it was continued. It was set for September 19th, it was continued. * * * So if this evidence was so important, it was given to your client on December the 2nd, this [text], and it takes eight to ten days to authenticate it, you could have done so before trial. * * * I think I've been more than gracious in granting as many continuances as I can, to allow you and defense team to strategize and come up with these — this evidence. * * * [Furthermore,] I don't think you are allowed to use extrinsic evidence to impeach the witnesses unless it goes to the truthfulness.

{¶25} Here, the trial court's decision was not unreasonably, arbitrarily, or unconscionably made. The trial court stated that it has previously granted eight continuances and noted the authentication could have been completed by defense counsel prior to trial. Furthermore, the trial court considered the admissibility of the text message under the Ohio Rules of Evidence. Under these circumstances, we do not find

that the denial of Watkins's continuance amounted to an abuse of discretion by the trial court.

**{¶26}** Therefore, the third assignment of error is overruled.

**{¶27}** Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

KENNETH A. ROCCO, P.J., and
EILEEN A. GALLAGHER, J., CONCUR