[Cite as *In re K.H.*, 2022-Ohio-2588.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE K.H., ET AL.           :

                         :

Minor Children             :

                         :

[Appeal by T.H., Mother]      :

No. 111287

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 28, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD21908011, AD21908012, AD21908013, AD21908014, and
AD21908015

---

### *Appearances:*

Michael Gordillo, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Zachary J. LaFleur, Assistant Prosecuting
Attorney, *for appellee*.

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Appellant-mother T.H. ("Mother") appeals from the decision of the
Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile court"),
adjudicating her five children neglected and dependent and granting temporary
custody of the children to appellee, the Cuyahoga County Division of Children and

Family Services ("CCDCFS" or "the agency"). Mother contends that the juvenile court abused its discretion in failing to dismiss the complaint after she requested a continuance, violating her right to due process. For the reasons that follow, we affirm.

**Factual Background and Procedural History**

{¶ 2} Mother has five children: K.H. (d.o.b. February 12, 2010), Ma.H. (d.o.b. September 2, 2013), My.H. (d.o.b. December 19, 2015), J.H. (d.o.b. June 23, 2017) and Hea.P. (d.o.b. June 26, 2018). J.R. is the father of K.H. T.G. is the father of Ma.H. K.B. is the father of My.H. Her.P. is the father of J.H. and Hea.P.

{¶ 3} On September 10, 2021, CCDCFS filed a complaint for dependency, neglect and temporary custody of the children,[1] along with a motion for predispositional temporary custody. The complaint was amended on October 18, 2021. As amended, the complaint alleged that (1) Mother "displays symptoms of a mental health condition" and has "anger issues" she has failed to address, (2) Mother was "overwhelmed" with the care of her children and experienced a "mental

---

[1] This matter involves a refiled complaint. A prior complaint for dependency, neglect and temporary custody was filed on May 17, 2021 with respect to each of the children (Cuyahoga C.P. Juv. Nos. AD21904155, AD21904156, AD21904157, AD2190804158 and AD21904159). On May 14, 2021, the children were placed in the emergency temporary custody of the agency pursuant to an ex parte telephonic order but were returned to Mother's care on May 17, 2021. On July 16, 2021, the children were again removed from Mother's care and placed in the emergency temporary custody of the agency on the juvenile court's motion for emergency temporary custody. The complaint was not resolved within statutory time limits and was dismissed. The children have remained in the continuous care and emergency temporary custody of the agency since July 16, 2021.

health crisis" on May 14, 2021 that prevented her from providing adequate care for the children and (3) Mother has a substance abuse issue related to marijuana that Mother has failed to adequately address. The complaint further alleged that the three older children had previously been in the emergency predispositional custody of CCDCFS from July 14, 2016 to October 24, 2016 in Cuyahoga C.P. Juv. Nos. AD16910638, AD16910639 and AD16910640 due, in part, to Mother's anger management issues.[2]

{¶ 4} Mother denied the allegations of the complaint and objected to the agency's request for predispositional temporary custody of the children.

{¶ 5} On September 13, 2021, the magistrate conducted a hearing on the agency's motion for predispositional temporary custody. Following the hearing, CCDCFS was granted predispositional temporary custody of the children.

{¶ 6} On October 12, 2021, CCDCFS filed the case plan for the family. The case plan required Mother to (1) undergo a drug and alcohol assessment,

---

[2] With respect to the children's fathers, the complaint alleged that they were either incarcerated or uninvolved with their children. Specifically, the complaint alleged: (1) as to J.R., father of K.H., that he had been convicted of assault, attempted drug possession and attempted intimidation of crime victim or witness, that he had failed to consistently visit or communicate with K.H. and that his current whereabouts were unknown; (2) as to T.G., father of Ma.H., that he had been convicted of burglary, theft, breaking and entering, aggravated theft, domestic violence, endangering children, attempted intimidation of crime victim or witness and robbery and that he was incarcerated and not scheduled for release until March 2024; (3) as to K.B., father of My.H., that he had been convicted of domestic violence, assault, aggravated theft, having weapons while under disability, obstructing official business, resisting arrest, trafficking offenses, improperly handling firearms in a motor vehicle and attempted robbery and that he was incarcerated and not scheduled for release until June 2022 and (4) as to He.P., father of J.H. and H.P., that he had been convicted of domestic violence and had failed to consistently visit or communicate with his children.

successfully complete any recommended treatment and aftercare and refrain from using drugs and alcohol and submit to random drug screens; (2) complete a psychological evaluation and comply with all treatment and medication recommendations and (3) complete a parenting program and demonstrate that she had benefited from the program.

{¶ 7} An adjudicatory hearing was originally scheduled for November 17, 2021. The hearing was converted to an attorney conference after Mother's counsel filed a motion to compel discovery, or, in the alternative, for in camera inspection of the agency's activity logs. Mother asserted that CCDCFS had failed to produce complete activity logs from May 17, 2021 through August 23, 2021. The state responded that the requested activity logs were confidential investigative materials that were not subject to disclosure under Ohio law. The magistrate granted Mother's motion, in part, and ordered that the records be provided to the court for in camera review.[3] The parties agreed to continue the adjudicatory hearing to December 7, 2021 and to conduct both the adjudicatory and dispositional hearings on that date — the 88th day of the 90-day disposition requirement pursuant to R.C. 2151.35(B)(1).

---

[3] The magistrate thereafter reviewed the CCDCFS records submitted for in camera review, redacted the portions of the records she determined were nondiscoverable and determined that Mother was entitled to access the remainder of the records. On November 29, 2021, the magistrate ordered that CCDCFS immediately produce the redacted records to all parties.

**Adjudicatory Hearing**

{¶ 8}    Mother was represented by the Office of the Cuyahoga County Public Defender (the "Public Defender's Office"). Prior to the adjudicatory hearing, Assistant Public Defender William Daugherty had been assigned to handle Mother's case and had met with Mother, reviewed all of the case materials and attended all of the hearings in the case on Mother's behalf. At the adjudicatory hearing, Salvatore Amata ("Amata"), Supervisor of the Juvenile Division of the Public Defender's Office, appeared for Mother. At the outset of the hearing, Amata made an oral motion for continuance, asserting that Daugherty was unavailable to appear for the hearing because Daugherty had been exposed to a client who had tested positive for COVID-19 and was, therefore, required to quarantine:

> Your Honor, as indicated to the Court earlier, this file has been handled by Bill. I think on a prior filing Mr. Daugherty had it, and then this filing which is on day 90 or day 88, and he has been working this case with [Mother] and he currently is being tested for COVID and unable to be here and is quarantined.
>
> I would ask that this matter be continued. I know that the 90 days may be up, but the matter could be refiled, so we're asking that the matter be continued pending further hearing.

{¶ 9}    The magistrate denied the motion due to statutory time constraints, explaining as follows:

> THE COURT: Okay. I can't grant a continuance. As you've clearly stated, statutory time has expired — is expiring. Excuse me. It has not expired, but will expire in two days, and we cannot waste time because this has already been refiled once. So that motion is denied.[4]

---

[4] Daugherty was not the only person who had an issue appearing in person at the December 7, 2019 hearing due to issues related to COVID-19. On December 6, 2021,

{¶ 10} Amata then indicated that Mother no longer wished to be represented by the Public Defender's Office and wanted another attorney appointed to represent her. The following exchange occurred:

THE COURT: * * * We've had the Public Defender. There's been nothing — this Court's never been notified until now that mother does not want to be represented.

Do you want to represent yourself? There's no attorney I can appoint that can come in here and try this case not having discovery or anything else, correct, Mr. Amata?

MR. AMATA: They're in the same position I would be in.

THE COURT: Well, it's your office so presumably you supervise your office.

MR. AMATA: But I don't supervise every individual case, and especially when an attorney's been on it for many, many months.

THE COURT: [Mother], do you wish to represent yourself or would you like to have the Public Defenders represent you?

* * *

[MOTHER]: I don't know.

THE COURT: You don't know. We're going to go forward, Mr. Amata.

{¶ 11} Amata proceeded to make an opening statement on behalf of Mother. He indicated that Mother has five children under the age of 11, that they can be

---

Mother's guardian ad litem filed a notice indicating that she was "unavailable to attend in-person hearings" due to "concerns about the transmission" of COVID-19 and recent exposure to the virus. Mother's guardian ad litem requested that she be permitted to attend the adjudicatory and dispositional hearings via telephone or video transmission, or, in the alternative, that a continuance be granted. The record reflects that Mother's guardian ad litem provided contact information so that she could participate via telephone or Zoom, but it is not clear from the record before us whether she, in fact, participated in the hearings remotely.

difficult to manage for a single parent and that Mother voluntarily contacted the agency requesting assistance with her children. He stated that shortly after contacting the agency, Mother felt that she was able to care for her children and wanted them back home with her. He indicated that most of the children wanted to be home with Mother and that it was in their best interest for Mother to "have her children back." CCDCFS and the remaining parties waived opening statements.

{¶ 12} Two witnesses testified at the adjudicatory hearing: former CCDCFS social worker Shannon Eggers ("Eggers") (who testified on behalf of the agency) and Mother's sister, K.A. (who testified on behalf of Mother).

{¶ 13} Eggers testified that she was employed as a CCDCFS social worker from April 2016 to August 2021 and was assigned to this case for "about three days," beginning on May 14, 2021.

{¶ 14} Eggers indicated that the case first came to the attention of the agency on May 14, 2021, after Mother called the CCDCFS hotline, stating that she was "overwhelmed" with the care of her children. Eggers stated that she was assigned to investigate the case, that she called Mother and asked, "what was going on and what the situation was," and that she offered Mother services. Eggers indicated that Mother told her she was overwhelmed with the care of her children due to their behavior and that she wanted to relinquish custody of the children to the agency. After speaking with Mother, Eggers called Mentor Ohio, a mental-health services agency, and they agreed to send someone to Mother's home to assess Mother. Eggers then drove directly to Mother's home.

{¶ 15} Eggers testified that when she arrived at Mother's home, Mother and her five children were there. Mother was "upset" and "aggressive," was "yelling" at Eggers and the children and she was crying. Eggers stated that Mother told Eggers that the children do not listen to her and were "destroying her home," that she did not want to be the children's caregiver anymore and that the children's behavior made her "want to kill herself." Eggers stated that Mother also told the children that she "didn't want them anymore" and "wanted to put them up for adoption, place them in foster care." Eggers testified that the children were "very upset" and asked Eggers "where they were going" and "why their mom didn't want them anymore."

{¶ 16} An Ohio Mentor social worker arrived at Mother's home approximately 25 to 30 minutes after Eggers arrived. Eggers testified that she updated him regarding what was occurring and asked if he could do an assessment of Mother and offer services to the family. Eggers stated that the Ohio Mentor social worker conducted an assessment in the home and offered Mother mental-health services that day but that Mother refused services. Eggers indicated that during the assessment, Mother disclosed that she used marijuana daily while caring for the children "to deal with the children's behaviors."

{¶ 17} Eggers testified that she asked Mother whether there were any relatives who could assist her with a safety plan and that Mother responded that there were none. Due to Mother's statements and behavior, which raised concerns about her mental health and Mother's disclosure of her daily drug use, Eggers concluded that the children could not remain safely in the home and the agency

obtained an ex parte telephonic removal order to remove the children from the home.

{¶ 18} Eggers testified that Mother was supposed to drive the children to the agency but proceeded to "run with" them and refused to inform the agency where the children were, telling CCDCFS workers to "catch" her and the children "if you can." Eggers stated that the agency filed missing person reports for the children and that the children were ultimately found at a relative's home and taken into agency custody. CCDCFS introduced certified copies of journal entries in Cuyahoga C.P. Juv. Nos. AD21904155-59, in which the court granted emergency temporary custody of all five children to CCDCFS on its own motion in July 2021, and copies of certified journal entries in Cuyahoga C.P. Juv. Nos. AD16910638-40, in which the court granted emergency temporary custody of K.H., Ma.H. and My.S. to CCDCFS in July 2016.

{¶ 19} With respect to the children's fathers, Eggers stated that paternity had been established for each of the children that identified each of the children's fathers. Eggers indicated that she had investigated each of the fathers and that the fathers were either incarcerated and/or were not involved in their children's lives.[5]

{¶ 20} Eggers testified that she was only involved in the case for a brief time because, on the evening of May 14, 2021, Mother "made a threat of physical harm"

---

[5] CCDCFS introduced certified copies of journal entries setting forth the prior criminal convictions of the children's fathers.

against her. The following week, Eggers filed a police report, obtained a temporary protection order and was removed from the case.

{¶ 21} Amata cross-examined Eggers. During her cross-examination, Eggers acknowledged that "everything [she] testified to was based on that one day that [she was] at the home and talked to [Mother]." Eggers further acknowledged that when she observed the children at their home on May 14, 2021, she saw nothing to indicate that the children had any health issues or required any medical attention and that, to her knowledge, there were no "immediate serious safety concerns" with the children's home. Eggers stated that once the children were in agency custody, they were "triaged." She indicated that none of the children had any significant medical conditions and that no concerns had been raised regarding education of the school-aged children.

{¶ 22} Amata questioned Eggers regarding Ohio Mentor's assessment of Mother and the journal entries related to the agency's prior involvement with the family. He also questioned Eggers regarding her decision to permit Mother to drive the children to the agency — given her signs of distress and threats to kill herself — the circumstances that led to the agency's involvement in the case and Mother's alleged drug use.

{¶ 23} Eggers stated that she was concerned about Mother driving the children to the agency but that Mother "was gone before I could do anything." Eggers indicated that she had not personally observed Mother using any drugs and acknowledged that the only reason the agency got involved in this case was because

Mother called the agency, i.e., that "but for" Mother's call stating that she was "overwhelmed," the agency "would not have been involved." No other parties cross-examined Eggers.

{¶ 24} Mother's sister, K.A., also testified at the adjudicatory hearing. K.A. testified regarding Mother's parenting abilities and what she recalled from the day the children were removed from Mother's care. K.A. stated that Mother and Mother's five children were living with her when Mother called "the lady," i.e., the CCDCSF social worker, and "[t]he lady came out." K.A. indicated that she could not recall "the lady's" name or exactly when the incident occurred but that the CCDCFS social worker and Mother had a "calm conversation." K.A. testified that Mother "was just telling the lady like she was overwhelmed," that "they had the conversation about what did she need help with" and that Mother explained she needed help with "daycare and all that."

{¶ 25} K.A. stated that she left for an appointment in the middle of the conversation and that, as she was leaving, a Caucasian male was arriving. She indicated that she did not know him.

{¶ 26} K.A. testified that Mother is a "normal mother" and that "[a]nybody with five kids would be overwhelmed." She denied that Mother "act[ed] in any hysterical way," made any threats to others or threatened to take her own life that day.

{¶ 27} After counsel presented their closing arguments, the magistrate found that "[e]vidence of each and every allegation of the Complaint has been

provided" and that "there is clear and convincing evidence that these children are neglected and dependent." Because the parties had previously waived bifurcation, the case proceeded directly to disposition.

**Dispositional Hearing**

{¶ 28} At the outset of the dispositional hearing, Amata reiterated Mother's request for a continuance. Once again, the magistrate denied said request.

{¶ 29} Amata made an opening statement on behalf of Mother. He asserted that "this case would not be where it is now but for [M]other's call for assistance" and that all Mother wanted was assistance — not for the agency to have her children. He maintained that the children were "not doing well" in foster care and would "do better with mom." Counsel for the children addressed the court and stated that the children "love their mother" and "want to be back with their mother." CCDCFS and the remaining parties waived opening statements.

{¶ 30} Tamicka Glenn, a CCDCFS social worker in the extended services department, was the sole witness at the dispositional hearing. She stated that she was assigned to the case on September 21, 2021.

{¶ 31} Glenn testified that the case plan required Mother to undergo mental health and drug assessments, to follow recommendations resulting from those assessments, to complete anger management and parenting classes and to demonstrate behavioral changes related to her interactions with the children.[6]

---

[6] With respect to the children's fathers, Glenn testified that Her.P. was also on the case plan and that he was to reestablish a relationship with his two children. She stated that Her.P.'s first video visitation with his children had been set up for later that week.

Mother completed a mental health and drug assessment with Moore Consulting. Glenn stated that no mental health concerns were identified during the assessment. With respect to the drug assessment, Glenn reported that Mother was diagnosed with a "severe" substance use disorder "in early remission" related to marijuana and that it was recommended that Mother complete a nonintensive outpatient drug treatment program but that Mother refused to attend the drug treatment program. Over Mother's objection, a certified copy of the assessment report was admitted into evidence.

{¶ 32} Glenn indicated that Mother's "angry outbursts" had resulted in a referral for anger management classes and that reports of Mother leaving the children inside the home while she used marijuana in her car had resulted in a referral for parenting classes. Glenn testified that Mother completed anger management and parenting classes through Beech Brook on October 18, 2021, but the agency had not observed "any behavioral changes" in Mother after completion of those classes.

{¶ 33} The case plan also required that Mother submit to random drug screens. Glenn testified that the results of a drug screen conducted on October 7, 2021 were "invalid" due to "urine concentration" and that Mother had failed to comply with subsequent requests for drug screens on November 15, 2021 and November 25, 2021.

Glenn indicated that the other children's fathers were not on the case plan because they were either incarcerated or their location was unknown.

{¶ 34} With respect to visitation, Glenn stated that Mother had two hours of supervised, weekly in-person visitation with the children beginning in late September 2021. The visits occurred at the Jane Edna Hunter Social Services building. Glenn indicated that the first two visits "went well," i.e., Mother "engaged with the children properly," Mother "interacted with the children well" and "[t]he children were excited to see her." These visits were only with the two younger children because, according to Glenn, Mother had declined evening visits and the three older children were in school.

{¶ 35} The October 12, 2021 visit, attended by My.H., Hea.P. and J.H., "didn't go so well." Glenn testified that, towards the end of the visit, Mother became "frustrated" and "irritated" with the children's behavior, that Mother told Glenn that the children "were bad and just don't bring them back" and that Mother told the children she was not coming back to visit. Glenn stated that she told Mother to "calm down" and "take a breath" and encouraged her to use some of the skills she had been learning in her parenting classes, e.g., being patient, trying to understand what was causing the children's behavior and responding to the children's behavior in a prosocial way but that Mother responded that "none of that work[s] unless they telling me to beat the children."

{¶ 36} All five children attended visitations on October 19 and November 2, 2021.[7] Glenn testified that, during the October 19, 2021 visit, Mother became "really

---

[7] Mother cancelled the visit scheduled for October 26, 2021.

frustrated" with the children because they were not following her directives and began to yell at the children, saying "things like," "I don't care if you guys don't ever come home. You guys are bad. You're worse than you were when I sent you guys away." Glenn stated that Mother told her not to bring the children back to visit and left the visit an hour early. Glenn testified that the children were "really upset" and "very hysterical," that J.H. was attempting to "escape the room" and that K.H. was acting "like he expected that to happen."

{¶ 37} Glenn testified that after the October 19, 2021 visit, she reached out to Mother to see if Mother would sign a release so the agency could arrange for a supportive visitation coach to assist Mother with visitation but that Mother did not respond.

{¶ 38} Mother's final visit with the children occurred on November 2, 2021. At that visit, Mother informed K.H. that his paternal grandmother had died. Glenn stated that K.H. appeared "visually upset" and asked Mother questions regarding what had happened to her but that Mother was "basically just ignoring him." Approximately an hour into the visit, the security guard informed them that Mother's mother was outside and wanted to attend the visitation. Glenn stated that she advised Mother that she would allow her mother to attend the visit this time, but she would not be permitted to attend future visits. Glenn testified that Mother "became irate" and "agitated," "use[d] profanity toward the security guard" and "just lacked self-control." Glenn stated that she asked the security guard to give Mother "a chance to calm down" and continue the visit but, due to Mother's continued

hostility and use of profanity in front of the children, Glenn terminated the visit, and the security guard escorted Mother from the building.

{¶ 39} Glenn testified that, based on what she observed during Mother's in-person visits with the children, it appeared that Mother had "regressed," necessitating additional referrals for services. She stated that the agency recommended that Mother undergo a second psychological evaluation and attend a "more intensive parenting program," but that Mother refused to do so.

{¶ 40} Glenn testified that following the November 2, 2021 visit, she continued to email Mother to provide updates regarding the children and to see what the agency could do to facilitate visitation. Glenn stated that she offered to set up video visitations between Mother and the children but that Mother did not respond.

{¶ 41} Glenn also testified regarding the children's placements and services. She stated that Ma.H. and Hea.P. had been placed in a foster home together and that K.H. and J.H. been placed in a foster home together and that they had remained in the same placements since July 2021.

{¶ 42} Glenn testified that the foster family of K.H. and J.H. has "had a lot of incidents with their behavior" and that they are working to get the children the services they need to "stabilize their behaviors." She stated that K.H. told her on December 1, 2021 that he did not want to go home and wanted to be adopted by the foster family. She indicated that J.H. "has a lot of confusion" and enjoys being in the foster home but "asks about his mother a lot." She stated that K.H. had been

diagnosed with severe depression, anxiety and PTSD and that J.H. had been diagnosed with ODD and that both boys receive medical management, psychiatric services and counseling. She stated that Mother did not want her children to be medicated or to see a psychiatrist but that the agency took those steps due to the children's reported behaviors.

{¶ 43} Glenn testified that Hea.P. and Ma.H. were doing "really well" in their placement. She stated that Hea.P. had some behavioral issues but was "easily redirected" and that Ma.H. had some recent incidents after visitation with Mother where she would become "withdrawn" and would "cry for no reason," so she had been referred for counseling. Glenn indicated that it was her understanding that both girls were "happy" in their placements but that Ma.H. "wants to go home as well."

{¶ 44} Glenn testified that due to his behavior, My.H. had been in seven different placements since July 2021. She stated that My.H. "hates caregivers," "curses at them" and "threatens to leave and run away from the home" but that he had been in his current placement since October 2021. Glenn indicated that his behavior had started to improve, that he was doing better in school and seemed happier. She stated that My.H. receives counseling, that he may have ADHD and that a recommendation had been made for him to see a psychiatrist but that they were awaiting to see what his pediatrician recommended.

{¶ 45} Glenn testified that although she believed reunification would ultimately be in the children's best interests, Mother needed "to develop the skills to

maintain self-control within herself" and "gain the skills to parent her children in a prosocial way, in a way that reduces her risk of doing something to harm them" before reunification could occur.

{¶ 46} Amata thoroughly cross-examined Glenn regarding Mother's visitation with the children, the visitation environment, the children's difficult behavior and the agency's efforts to make the visits run more smoothly. Amata also questioned Glenn at length regarding the children's placements and services, Mother's substance abuse assessment and the nature of the drug treatment program to which the agency had referred Mother, the extent of Mother's compliance with the anger management and parenting class components of the case plan and whether Glenn was in a position to accurately assess whether Mother had sufficiently benefitted from such services given her limited interactions with Mother.

{¶ 47} Mother presented no witnesses at the dispositional hearing.

{¶ 48} After Glenn testified, the children's guardian ad litem[8] presented her recommendation. The children's guardian ad litem had submitted a written report on November 24, 2021 in which she recommended that temporary custody of the children be granted to the agency until Mother can "engage [in] and complete * * * her case plan services and exhibit a benefit from services which would be reflected

---

[8] The children's guardian ad litem had previously served as the guardian ad litem for all five children in Cuyahoga C.P. Juv. Nos. AD21904155-AD21904159 and for K.H., Ma.H. and My.H. in Cuyahoga C.P. Juv. Nos. AD16910638-AD16910640.

in stable and appropriate behavior during visits with the children" and "maintain housing appropriate for the children and free of safety hazards."

{¶ 49} The children's guardian ad litem described the difficult interactions she had had with Mother and stated that she was concerned that no visitation was occurring between Mother and the children. The children's guardian ad litem indicated that when she attempted to have a face-to-face meeting with Mother, Mother refused to talk with her and that once, during a visitation, Mother attempted to have her removed from the visitation — but that she refused to leave. The children's guardian ad litem stated that visit — with two of the children — ultimately "went well" but that reports from other visits with the children were "horrendous" and "indicative of the kind of chaos" that she believed "goes on in the home when the children are at home." The children's guardian ad litem stated that Mother's "inability to control her anger" is the focal point of the case and that, in her view, "[t]here's a lot of work to be done" and Mother is "resistant to doing that work." Amata briefly questioned the children's guardian ad litem regarding the extent and frequency of her interactions with Mother. No one else questioned the children's guardian ad litem.

{¶ 50} In his closing argument, Amata advocated for Mother, requesting that the court deny the agency's request for temporary custody and return the children to Mother with protective supervision. He pointed out that Mother had "technically" completed most of her case plan and questioned if it could be fairly assessed whether Mother had benefited from services "unless [M]other has the children with her."

Amata asserted that the children had not been abused or neglected and that there was no reason to believe Mother would harm the children. He explained that services could be continued if the children were returned to Mother and argued that services "would be much more effective" and that Mother's progress "could be much more objectively measured" if the children were with her.

**The Magistrate's Written Decision**

{¶ 51} On December 8, 2021, the magistrate issued a written decision, adjudicating the children neglected and dependent and granting temporary custody of all five children to the agency. The magistrate found that the allegations of the complaint had been proven by clear and convincing evidence, that there was probable cause for the removal of the children pursuant to R.C. 2151.31, that the children's continued residence in or return to Mother's home would be contrary to their best interest and that the agency had made reasonable efforts to prevent removal of the children from their home, to eliminate the continued removal of the children from their home or to make it possible for the children to return home. As it relates to Mother, the magistrate further found:

> Case plan objectives for the mother are mental health assessment with recommendations, substance abuse assessment and recommendations, anger management, and parenting education. The mother has been referred to Moore Counseling, Beech [B]rook and Advantage Health. The mother had no recommendations for mental health. The mother was referred to complete a substance abuse program but did not comply. The mother has completed anger management and parenting education but fails to demonstrate a benefit from the service. The mother will not allow the worker inside her home and doe[s] not wish to speak with the worker.

The magistrate also found that the children were all "happy" in their current placements.

**Mother's Objections to the Magistrate's Decision**

{¶ 52} On December 17, 2021, Mother filed objections to the magistrate's decision, challenging the magistrate's denial of her oral motion for continuance. Mother claimed that the magistrate should have granted her motion for continuance because (1) she was "entitled to be represented by effective counsel," (2) Daugherty, the attorney who had been working on Mother's case and who had been preparing for the adjudicatory and dispositional hearings, learned that he had been exposed to COVID-19 the afternoon before the scheduled hearings and could not appear in person for the hearings, (3) Amata, who ultimately represented Mother at the adjudicatory and dispositional hearings, had never met Mother, had never had a conversation with her and had "very little time to review the file" before the hearings, (4) Mother's guardian ad litem was also quarantining due to COVID-19 exposure and could only appear remotely for the hearings and (5) "[d]ismissal and refiling of the present case would not likely have changed the placement of the children but would have maintained the status quo." Mother argued that the adjudicatory and dispositional hearings should "be reheard with [M]other having effective counsel."

{¶ 53} In support of her objections, Mother attached an affidavit from Daugherty, which included additional information regarding the circumstances surrounding his unavailability for the December 7, 2021 hearings. Daugherty averred that, at approximately 1:00 p.m. on December 6, 2021, he learned that he

had been exposed to COVID-19 at a hearing several days earlier, that, pursuant to office protocol, he was required to leave the workplace and self-quarantine until he obtained a negative COVID-19 test and that he was unable to obtain an appointment for a COVID-19 test until after the scheduled hearings. He further averred that he had been the only attorney in the Public Defender's Office who had worked on the case and that, "[d]ue to the requirement to leave the workplace and self-quarantine upon discovering the exposure, there was no opportunity to adequately prepare a replacement attorney for the adjudication and disposition hearings." Amata asserted that he had been advised of Daugherty's unavailability for the hearings at 2:50 p.m. on December 6, 2021.

{¶ 54} CCDCFS filed a brief in support of the magistrate's decision and opposition to Mother's objections. The agency argued that the magistrate properly denied Mother's request for a continuance because (1) the agency had made arrangements for an outside witness to appear for the hearing, (2) the December 7, 2021 date had been agreed to by all parties, (3) as of December 7, 2021, the children had been in emergency temporary custody of the agency for 144 days, (4) a continuance would have required refiling of the complaint, further delaying permanency for the children, which was not in their best interest, and (5) there was no evidence in the record that Amata had failed to "competently represent" and "effectively assist" Mother at the adjudicatory and dispositional hearings.

{¶ 55} On January 13, 2022, the juvenile court held a hearing on Mother's objections to the magistrate's decision. Both Daugherty and Amata appeared at the

hearing. At the hearing, Amata made it clear that Mother was "not objecting to anything that happened in the trial" and was only objecting to the magistrate's denial of Mother's motion for continuance. Amata argued that Mother was entitled to have "properly prepared" counsel try her case and that although granting the continuance might have required the juvenile court to dismiss (and the agency to refile) the complaint, "it happens all the time" and was not "gonna cause any harm to anyone because the children would have stayed where they were."

{¶ 56} With respect to his preparation for the adjudicatory and dispositional hearings, Amata indicated that he had "locate[d] a file, but there was no discovery" and that Daugherty had contact with witnesses of whom he had no knowledge. Amata stated, "I indicated to the Magistrate that I was not prepared to go forward and that I would be ineffective if the trial did go forward."

{¶ 57} The juvenile court inquired whether a request had been made to allow Attorney Daugherty to participate in the adjudicatory and dispositional hearings remotely, e.g., via Zoom. Daugherty confirmed that no such request had been made but stated that he had "got into contact with the Clerk" and was told that his "best option" was "to have somebody * * * be present."

{¶ 58} The state challenged Mother's attempts to characterize the case "as some sort of complicated case that Mr. Daugherty has extensive knowledge of, [where] he's the only one able to proceed." The state noted that, as it related to Mother, the only contested issues were whether Mother "display[ed] symptoms of a mental health condition and anger issues" or "had substance abuse issues." The

state asserted that "[t]here was no reason that a colleague of Mr. Daugherty's couldn't, in conjunction with Mr. Daugherty, have gotten him or herself up to speed and be able to present a case." The state further argued that, to the extent Mother was arguing ineffective assistance of counsel, she could not show that "there was anything that * * * could have [been] done more or differently." The state asserted that, "on these facts, Mr. Daugherty being here wouldn't have made any difference at all and * * * the outcome would have been exactly the same" because "the testimony is essentially that there's been very little progress on the case plan."

{¶ 59} After listening to the recording of the hearings, reviewing "the entire case file" and considering the arguments of counsel, the juvenile court overruled Mother's objections, finding them "not well-taken." The juvenile court then affirmed, approved and adopted the magistrate's decision adjudicating the children neglected and dependent and granting temporary custody of the children to the agency.

{¶ 60} Mother appealed, raising the following sole assignment of error for review:

> The trial court abused its discretion by denying appellant's motion to dismiss in violation of appellant's right to due process.

**Law and Analysis**

{¶ 61} In her assignment of error, Mother asserts that the juvenile court abused its discretion in refusing to dismiss the complaint under R.C. 2151.35(B)(1)

when a "prepared attorney" was not available to represent Mother at the adjudicatory and dispositional hearings.

{¶ 62} R.C. 2151.35(B)(1) provides:

If the court at an adjudicatory hearing determines that a child is an abused, neglected, or dependent child, the court shall not issue a dispositional order until after the court holds a separate dispositional hearing. The court may hold the dispositional hearing for an adjudicated abused, neglected, or dependent child immediately after the adjudicatory hearing if all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing. The dispositional hearing may not be held more than thirty days after the adjudicatory hearing is held. The dispositional hearing shall not be held more than ninety days after the date on which the complaint in the case was filed except that, for good cause shown, the court, on its own motion or on the motion of any party or the child's guardian ad litem, may continue the dispositional hearing for a reasonable period of time beyond the ninety-day deadline. This extension beyond the ninety-day deadline shall not exceed forty-five days and shall not be available for any case in which the complaint was dismissed and subsequently refiled.

If the dispositional hearing is not held within the period of time required by this division, the court, on its own motion or the motion of any party or the guardian ad litem of the child, shall dismiss the complaint without prejudice.

Because this case is a refiled case, the 90-day deadline for the dispositional hearing could not be extended. *Id.*

{¶ 63} CCDCFS responds that Mother's argument is meritless because Mother "at no point entered a motion to dismiss" and, therefore, "only the denial of the motion to continue is preserved for purposes of appeal." Although Mother never filed a motion to dismiss the complaint below, we recognize that, given the timing of the juvenile court's ruling, if the juvenile court had sustained Mother's objections to the magistrate's decision denying her motion for continuance, the juvenile court

would have been required to dismiss the complaint under R.C. 2151.35(B)(1). Accordingly, we will consider the issue. However, we agree that Mother's argument is meritless.

{¶ 64} Where a party timely objects to a magistrate's decision, the juvenile court must "undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." Juv.R. 40(D)(4)(d); *see also* Civ.R. 53(D)(4)(d). This "independent review" requires the juvenile court to "'conduct a de novo review of the facts and an independent analysis of the issues to reach its own conclusions about the issues in the case.'" *In re I.R.Q.*, 8th Dist. Cuyahoga No. 105924, 2018-Ohio-292, ¶ 23, quoting *Radford v. Radford*, 8th Dist. Cuyahoga Nos. 96267 and 96445, 2011-Ohio-6263, ¶ 13.

{¶ 65} Juv.R. 23 governs continuances in juvenile court. It states that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." Loc.R. 35(C) of the Cuyahoga County Court of Common Pleas, Juvenile Division, further provides:

> No case will be continued on the day of trial or hearing except for good cause shown, which cause was not known to the party or counsel prior to the date of trial or hearing, and provided that the party and/or counsel have used diligence to be ready for trial and have notified or made diligent efforts to notify the opposing party or counsel as soon as he/she became aware of the necessity to request a postponement. This rule may not be waived by consent of counsel.

{¶ 66} The grant or denial of a motion to continue is a matter that is generally "'entrusted to the broad, sound discretion of the trial judge.'" *In re Ka.C.*,

8th Dist. Cuyahoga Nos. 102000, 102002, 102005, and 102006, 2015-Ohio-1158, ¶ 13, quoting *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). A court abuses its discretion when its decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983); *In re Ka.C.* at ¶ 13.

{¶ 67} Where the granting of a continuance is necessary to allow a party a reasonable opportunity to prepare his or her case, the denial of a request for a continuance may violate a party's right to due process. *See, e.g., State v. Sowders*, 4 Ohio St.3d 143, 144, 447 N.E.2d 118 (1983) ("It is a basic due process right * * * that a defense counsel be afforded the reasonable opportunity to prepare his case."); *see also In re R.S.,* 8th Dist. Cuyahoga No. 99562, 2013-Ohio-5576, ¶ 17, citing *In re A.C.*, 6th Dist. Lucas No. L-10-1025, 2010-Ohio-4933, ¶ 128. However, not every denial of a motion for continuance is a denial of due process. *In re C.W.*, 8th Dist. Cuyahoga No. 109219, 2020-Ohio-3189, ¶ 16.

{¶ 68} As the Ohio Supreme Court explained in *Unger*: "'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" *Unger* at 67, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *see also In re I.N.*, 8th Dist. Cuyahoga No. 110067, 2021-Ohio-1406, ¶ 17; *In re A.W.*, 8th Dist. Cuyahoga No. 109239, 2020-Ohio-3373, ¶ 26. "Weighed against any potential prejudice to a [party] are concerns such as a court's

right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *Unger* at 67.

{¶ 69} When evaluating a request for a continuance, courts generally consider

> the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Id.* at 67-68; *see also In re I.N.* at ¶ 17; *In re A.W.* at ¶ 27. However, a court is not required to give particular weight to any one of these factors. *State v. Urbina*, 3d Dist. Defiance Nos. 4-21-08 and 4-21-09, 2021-Ohio-4254, ¶ 13, citing *Musto v. Lorain Cty. Bd. of Revision*, 148 Ohio St.3d 456, 2016-Ohio-8058, 71 N.E.3d 279, ¶ 23. In matters involving custody of children, courts must also "be mindful of the best interests of the children and their need for stability and permanency" in considering a request for a continuance. *In re I.N.* at ¶ 16.

{¶ 70} Mother has not shown that she was denied due process or that the juvenile court otherwise abused its discretion in overruling her objections to the magistrate's decision and in failing to dismiss the agency's complaint pursuant to R.C. 2151.35(B)(1). There is nothing in the record to suggest that granting a continuance was "imperative to secure fair treatment for the parties," Juv.R. 23, or that the juvenile court's decision was otherwise unreasonable, arbitrary or

unconscionable. Further, Mother has not shown that she was prejudiced by the denial of her motion for continuance.

{¶ 71} Following the timely filing of Mother's objections to the magistrate's decision, the juvenile court held a hearing on Mother's objections. The record reflects that the juvenile court carefully considered Mother's objections, the agency's response to Mother's objections and the parties' arguments relating to Mother's motion for continuance. The record further reflects that the juvenile court listened to the recording of the adjudicatory and dispositional hearings and reviewed the entire case file before ruling on Mother's objections. In its January 20, 2022 journal entry, the juvenile court set forth the following findings in support of its decision overruling Mother's objections to the magistrate's denial of her motion for continuance:

> The Court finds that Mr. Amata who appeared in Court on December 7, 2021, in place of the quarantined attorney Mr. Daugherty, effectively and zealously represented the interests of mother. Upon review of the record, this Court did not feel an argument could be made for ineffective assistance of counsel. Substituting public defenders as well as prosecutors is a common occurrence in Cuyahoga County Juvenile Court. It was clear from review of the recording that Mr. Amata had reviewed Mr. Daugherty's notes, court file and relevant papers and was well prepared to address the limited issues outlined in the original complaint.

{¶ 72} Mother has not challenged any of these findings on appeal. The juvenile court's decision was well-reasoned, and the record fully supports the juvenile court's findings and decision overruling Mother's objections to the denial of her motion for continuance.

**{¶ 73}** At the time Amata requested the continuance, it was unknown when Daugherty would be available to appear in person for the hearing, i.e., there was no indication if the hearings were continued to December 8 or 9, 2021 — to allow for disposition within the 90-day statutory deadline — whether Daugherty would be able to attend the hearings in person. No request was made to allow Daugherty to participate in the hearings remotely, i.e., via telephone or Zoom.

**{¶ 74}** Although Amata had limited time to prepare for the hearings, this was not a complicated case and did not present any difficult or unique legal or factual issues. The complaint contained three allegations against Mother: (1) that Mother displayed mental health and anger management issues related to being overwhelmed with caring for the children; (2) that Mother had a substance abuse problem related to marijuana and (3) that the three older children were previously removed from Mother's care in 2016 due to anger management concerns. Amata, Supervisor of the Juvenile Division of the Public Defender's Office, had been practicing in this area for many years.

**{¶ 75}** There was no claim that Amata was unable to discuss the case with Daugherty or was unable to review all of the relevant case file materials in advance of the hearing. Only two witnesses testified at the adjudicatory hearing: the agency presented testimony from a former CCDCFS social worker and Mother presented testimony from her sister. A single witness testified at the dispositional hearing: the agency presented testimony from the CCDCFS social worker currently assigned to the case. As the juvenile court observed, Amata competently and capably

represented Mother throughout the adjudicatory and dispositional hearings. He presented a well-reasoned opening statement and closing argument that demonstrated familiarity with the limited facts of the case, he made appropriate objections throughout the hearings and he zealously and effectively cross-examined each of the agency's witnesses. There is no indication in the record that Mother would have offered additional or different evidence (or made additional or different arguments) if Daugherty (or some other more prepared attorney) had been defending Mother at the hearings instead of Amata. *See, e.g., In re A.C.*, 2010-Ohio-4933, at ¶ 132 (where Father did not identify any particular evidence, argument or defense he was unable to present at adjudicatory hearing due to the purported lack of preparation of counsel, denial of continuance did not provide a basis for reversal on appeal).

{¶ 76} Furthermore, the decision from which Mother is appealing is the juvenile court's decision adjudicating her five children neglected and dependent and awarding temporary custody of the children to CCDCFS. The record shows that, although Mother had completed anger management and parenting classes, she had not sufficiently benefitted from those services to appropriately parent her children. As Glenn testified, during weekly, supervised visitation with the children, Mother struggled to maintain control, became frustrated and irritated with the children when they did not follow her directives and repeatedly told the children that she did not want to visit with them or did not want them to return home. After a couple of

challenging visitation sessions, Mother refused visitation with any of her children for more than a month prior to the hearing.

{¶ 77} The record further shows that Mother had admitted using marijuana when caring for the children to cope with the children's behavior, that Mother had been diagnosed with a severe substance abuse disorder, that Mother had failed to complete a recommended drug treatment program and that Mother had failed to submit to random drug screens to confirm her sobriety. The record also reflects that Mother was refusing to communicate with Glenn and the children's guardian ad litem and that Mother was refusing to permit the agency access to her home.

{¶ 78} Given these facts, even if Mother had been granted a brief continuance within the statutory time frame to permit Daugherty to participate in the hearings in person (or for some other more prepared attorney to represent Mother at the hearings), there is nothing to indicate it would have changed the decision to adjudicate the children neglected and dependent and to award temporary custody of the children to CCDCFS. Mother has not challenged the juvenile court's determinations with respect to adjudication or disposition of the children. Moreover, if Mother believed that Daugherty's presence at the hearings was necessary or helpful, she could have requested that he be permitted to participate in the hearings remotely via telephone or Zoom. Daugherty was not ill; due to COVID-19 protocols, he simply could not go back to the office or appear in-person for court proceedings until he obtained a negative COVID-19 test.

{¶ 79} If, however, the juvenile court had granted the motion for continuance and the dispositional hearing had not been held within the statutory time frame — necessitating dismissal of the complaint under R.C. 2151.35(B)(1) — it could have clearly had an adverse impact on the children and other parties to these proceedings. This case is already a refiled case. If the complaint was to be dismissed, new pleadings would have to be filed and served, new arraignments and other preliminary proceedings would need to be held and new case schedules would need to be established — needlessly expending already limited resources and further delaying resolution of the case and permanency and stability for the children.

{¶ 80} Following a thorough review of the record, we cannot say that the juvenile court abused its discretion in overruling Mother's objections to the denial of her motion for continuance and in failing to dismiss the complaint. Mother's assignment of error is overruled.

{¶ 81} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MICHELLE J. SHEEHAN, J., and
EILEEN T. GALLAGHER, J., CONCUR